No. 110,311

STATE OF KANSAS, *Appellee*, v. REGINALD O. DUPREE, *Appellant*.

(373 P.3d 811)

378

Opinion
filed April 29, 2016.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Reginald Dupree appeals his convictions for felony murder, kidnapping, aggravated burglary, aggravated robbery, two counts of aggravated endangering a child, and aggravated assault. On appeal, Dupree raises a total of eight arguments, which can be generally categorized as follows: two charging information issues, a sufficiency of the evidence challenge, three jury instruction issues, a witness sequestration issue, and a cumulative error argument. For the reasons set forth below, we affirm Dupree's convictions.

## FACTUAL AND PROCEDURAL HISTORY

On the evening of December 14, 2011, two intruders pushed their way into a Wichita home (the "Locust Street home"). The homeowner's 19-year-old daughter, Regina Stuart, was home at the time with her boyfriend, Markez Phillips, and her 5month-old nephew. Someone knocked on the side door, and when Phillips went to answer there was a struggle. As Phillips tried to close the door on the intruders, one of them shot him in the face. Two men then entered and forced Stuart to accompany them while they went throughout the house looking for valuables; the two men, plus another intruder, ultimately left with several televisions.

Investigators soon linked five men to the crime. The State charged Dupree with seven criminal counts: first-degree felony murder, kidnapping, aggravated burglary, aggravated robbery, two counts of aggravated endangering a child, and aggravated assault. At trial, Dupree did not deny that he was involved in the crimes and was one of the two initial intruders; nor, in asserting his arguments on appeal, does he deny his involvement. Instead, he took the stand in his own defense and explained he was an unwilling or unaware participant and never intended to rob or shoot anybody.

Given Dupree's admission to being present when the crimes occurred, we need not discuss many of the evidentiary details heard by the jury in this lengthy trial. Instead, we will confine ourselves to the essential facts necessary to understanding his issues on appeal.

Many of these essential facts stem from Stuart's testimony. Although she did not know the two men who first entered her home, she later identified them as Dupree and Malek Brown. She told the jury the men entered the room where she had been watching television; she described them as rounding the corner into the room at the exact same time. One man, Brown, held a black handgun. Stuart testified both men asked her for her cell phone, wallet, and money. She told them she only had her phone, which she gave to them. Brown then put the gun to the back of her head, and both men forced her to move room to room while asking her about the location of a safe. She repeatedly told Dupree and Brown there was no safe, but both said she was lying and threatened to kill her. Eventually she told the men to just take the televisions. She heard Brown make a phone call and ask someone to pull up and help him load the televisions.

After Brown made the phone call, Dupree told her to sit in a chair, but Brown made her lie face-down on the floor next to her nephew. At this point a third person, whom Stuart recognized as Daniel Dupree, entered the house. Daniel seemed shocked to see Phillips on the ground and asked Dupree what they were doing. Daniel told the men they needed to leave and were not supposed to have killed anybody. The men then took televisions out of the house.

Stuart testified it did not seem Brown forced Dupree to do anything, and she never heard Dupree say anything to this effect. She never saw Brown point a gun at Dupree or tell him to take valuables from the house. Although Brown had the gun the entire time and did most of the talking, Dupree pushed her through the house and also threatened to kill her. The men separated at one point when Dupree was getting the living room television and Brown was in the back of the house; Stuart testified Dupree could have left at this point because he was not in danger from Brown. He did not do so, and it did not appear to Stuart that he wanted to.

The State presented other evidence implicating Dupree and the other men in the crimes. Stuart's grandmother, along with another of Stuart's nephews, encountered the men as they were leaving the Locust Street home, and one of the men pointed a gun at them. Others testified about their observations of and conversations with Dupree and his companions both before and after the crimes. In general, these witnesses did not observe anything indicating Dupree was ill on the day of the shooting or suggesting he had been coerced to participate. In addition, video from a nearby security camera corroborated the testimony of Stuart, her grandmother, and Dupree about the incident: a Jeep drove up to the Locust Street home, two occupants got out and moved toward the home, and the Jeep returned after a few minutes and backed up the driveway so the men could load the televisions.

The defense presented only one witness: Dupree. Dupree testified that the day of the shooting he felt like he was coming down with something—his nose was running, he had an itchy throat and the chills, and he was tired. As the day went on, he felt worse and worse. During the afternoon or evening, Dupree asked for a ride to get some medicine. Dupree, Francis Dupree, and Daniel Dupree all got into a Jeep driven by Brown. Dupree testified that Brown seemed upset, possibly intoxicated or high, and did not seem like himself. Brown announced he had to pick something up first and pulled into a neighborhood. Brown circled the block a few times before pulling in front of a house. He asked the passengers to help him get some stuff. But when they all got out, Brown said, "I don't think this is the house." So the men all got back in the vehicle and left.

According to Dupree's testimony, after driving around for a bit longer, Brown decided the house they went to was the right one after all. He drove back to the house and parked, at which time Dupree told Brown he felt poorly and his body was aching. Brown replied, "Come with me." They walked up to the house, and Brown knocked at the side door. Dupree then said, "I forgot my phone in the car. I'll be right back." He turned to walk away. As soon as he did, he heard the door open. Brown said something, and the man inside the house replied, "I said I was going to beat your ass if I

see you again." Before Dupree got halfway down the driveway he heard a pop.

Dupree testified he was scared and jogged back to the doorway to see what had happened. He saw Phillips on the ground and Brown with a gun in his hand. He asked Brown what he was doing, but Brown did not reply and just waved the gun at him. Brown's attorney asked whether Brown *pointed* the gun at him, and Dupree replied, "You can say that." Dupree hesitated at the threshold, but Brown waved the gun again and said, "Come on." When Dupree entered the Locust Street home he saw Stuart standing in the living room. Brown took her phone and then asked about a safe and some money. Brown pointed the gun at Stuart's back and made her lead him around the house. Dupree stayed close because he did not know what was going on.

Dupree testified that after Brown called for help loading the televisions, Brown told Dupree to stop standing around and help. Dupree complied because he was shocked and did not want anything else to go wrong. On his way out, he saw Daniel enter the house and heard him tell Brown he was not supposed to have shot anybody. As they were driving away, Daniel kept yelling at Brown for shooting someone.

On cross-examination, Dupree explained he did not leave after hearing a gunshot and seeing Phillips on the ground because he was afraid for his life. Although Brown did not threaten him, he waved his gun at him. Dupree denied ever speaking to Stuart at any time while in the Locust Street house and also denied pushing her around. According to Dupree, only Brown ordered Stuart around and forced her through the house. Dupree also admitted he had his phone and could have called the police but did not. And on redirect, Dupree stated he did not intend to rob anybody or see anybody shot.

The jury found Dupree guilty on all seven counts. After denying Dupree's posttrial motions for a new trial and judgment of acquittal, the district court sentenced him to a total sentence of life imprisonment, with 20 years' minimum, plus 122 months. Dupree now appeals from his convictions. We have jurisdiction over his appeal pursuant to K.S.A. 2015 Supp. 223601(b)(3) (permitting a

direct appeal to the Kansas Supreme Court in any case where a maximum sentence of life imprisonment has been imposed).

## ANALYSIS

Dupree raises eight arguments on appeal, and, as we briefly mentioned above, they can be categorized as arguments relating to deficiencies in the charging information, sufficiency of the evidence, the jury instructions, witness sequestration, and cumulative error. We will address his claims in that order.

ISSUE 1: *The State's failure to charge Dupree specifically with "aiding and abetting" aggravated assault and aggravated child endangerment offenses did not deprive the district court of jurisdiction over these offenses.*

Dupree contends the State's failure to charge him specifically with *aiding and abetting* aggravated assault and aggravated child endangerment rendered the charging information insufficient, such that it never conferred subject matter jurisdiction on the district court. He argues there was no evidence he committed these offenses as a principal, and thus the State's failure to charge him specifically as an aider and abettor requires these convictions be reversed. He acknowledges he failed to raise this argument before the district court, and he also acknowledges our precedent is contrary to his claim.

In making his argument, Dupree relies on past cases in which we have stated that, "if a complaint fails to include an essential element of a crime charged, it is 'fatally defective, and the trial court lacks jurisdiction to convict the defendant of the alleged offense.'" *State v. Gonzales*, 289 Kan. 351, 366, 212 P.3d 215 (2009) (quoting *State v. Moody*, 282 Kan. 181, 197, 144 P.3d 612 [2006]). He also notes that issues involving subject matter jurisdiction may be raised at any time, and we review de novo whether a charging information conferred subject matter jurisdiction on the courts. *State v. Williams*, 299 Kan. 509, 532, 324 P.3d 1078 (2014). Although these arguments accurately reflect our past caselaw, parties in other pending cases have raised questions recently about whether a defective complaint is truly jurisdictional. See, *e.g., State v. Dunn*,

No. 106,586, 2012 WL 3290004 (Kan. App. 2012), rev. granted 298 Kan. 1205 (2013). But the State has not raised those arguments here. Further, we need not resolve the question because, even under the cases Dupree cites, he fails to establish a charging defect that would entitle him to relief.

Turning to the specifics of Dupree's argument, he asserts that aiding and abetting is a specific intent crime with a separate, additional element of proof beyond the elements of aggravated child endangerment and aggravated assault—namely, the specific intent to aid and abet. See K.S.A. 2015 Supp. 21-5210. According to his theory, that means the charging information must allege that the defendant aided and abetted the commission of a crime. Absent that specific allegation, he argues, the information was fatally defective.

Three aiding and abetting liability statutes that have been in effect in Kansas at one point or another put Dupree's argument in context. Prior to July 1969, the Kansas aiding and abetting statute read: "Any person who counsels, aids, or abets in the commission of any offense *may be charged, tried and convicted in the same manner as if he were a principal.*" (Emphasis added.) G.S. 1949, 621016. This older statute expressly permitted the State to charge a defendant as a principal even if the defendant was only an aider and abettor.

From July 1969 to July 2011 (several months before the December 2011 events at issue in this case), Kansas utilized K.S.A. 21-3205(1), which read: "A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime." Dupree stresses that K.S.A. 213205 did not retain the "may be charged . . . in the same manner" language of the prior statute. He argues this indicated the legislature intended a change that can only be read as the imposition of a pleading requirement. But this court implicitly rejected that in 1976, when comparing 213205 with its predecessor and concluding "there is very little, if any, difference in the meaning of the language used in the two sections." *State v. Motor*, 220 Kan. 99, 102, 551 P.2d 783 (1976). Moreover, we have "consistently held that the State is not required to charge aiding

and abetting in the charging document in order to pursue a theory of accomplice liability at trial." *Williams*, 299 Kan. at 533; see *e.g.*, *State v. Betancourt*, 299 Kan. 131, 140, 322 P.3d 353 (2014).

*Williams*, which was published after Dupree filed his appellate brief, represents one of our more recent affirmations of this long-standing rule. The *Williams* defendant, like Dupree, had argued the district court lacked subject matter jurisdiction over certain offenses because the State failed to separately charge aiding and abetting. See 299 Kan. at 53233. Also like Dupree, the *Williams* defendant contended aiding and abetting required different elements of proof than the elements of committing the underlying crime as a principal. 299 Kan. at 533. We rejected these arguments and cited with approval previous precedent that "'aiding and abetting is not a separate crime in Kansas. Instead, it extends criminal liability to a person other than the principal actor.'" 299 Kan. at 533 (quoting *State v. Robinson*, 293 Kan. 1002, 1038, 270 P.3d 1183 [2012]).

Nevertheless, *Williams* only addressed K.S.A. 21-3205, which was the statute in effect at the time of the crime and trial in that case. 299 Kan. at 533. We did note, however, that 21-3205 had been repealed and replaced with a new aiding and abetting liability statute, K.S.A. 2010 Supp. 21-5210. L. 2010, ch. 136; sec. 30; see *Williams*, 299 Kan. at 533. *Williams* declined to address this newest statute.

Now, because K.S.A. 2011 Supp. 21-5210(a) was the statute in place at the time of Dupree's crime and trial we must determine the pleading requirements under its terms. It provides: "A person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to the commit the crime or intentionally aids the other in committing the conduct constituting the crime."

The difference between our present statute and the earlier statute discussed in *Williams* comes down largely to formatting; in other words, we see no meaningful difference supporting a departure from *Williams*. Under K.S.A. 2015 Supp. 21-5210 the State is not

required to use the words "aiding and abetting" in the charging document in order to pursue a theory of accomplice liability at trial.

Dupree's charging information thus did not fail to allege an essential element of the crimes of aggravated child endangerment and aggravated assault. See *Gonzales*, 289 Kan. at 366.

ISSUE 2: *The State's oral amendment to the felony-murder charge did not deprive the district court of jurisdiction or otherwise constitute reversible error.*

Dupree's second jurisdictional argument relates to the State's oral amendment, at the close of evidence, to the felony-murder charge. The State's motion, which was made after the district court had denied Dupree's motion for acquittal, requested permission to change the underlying felony from aggravated robbery to aggravated burglary.

Dupree's counsel responded by saying, "I suppose for the record, I would [object]." He argued that he approached the case with the idea that "agg[ravated] robbery was the underlying felony." The State contended there was no prejudice to Dupree, since during the preliminary hearing the district court approved both the aggravated robbery and aggravated burglary charges and thus both had to be proved all along. Dupree had no response, and the district court permitted the State's amendment. It also specifically found that Dupree was "not prejudiced whatsoever" by the amendment because he was aware of the aggravated burglary charge and had the opportunity to meet that charge.

Now, on appeal, Dupree urges us to conclude the State's amendment was not sufficiently specific. Additionally, while he recognizes the State need not always formally file an amended complaint, he contends its failure to do so in this case prejudiced his defense and constituted reversible error.

In general, the State bears the burden of filing a written complaint setting forth the essential facts constituting the crime charged. See K.S.A. 22-3201(b). The State may, with the district court's leave, amend an information "at any time before verdict . . . if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." K.S.A. 22-3201(e). This

amendment may be oral, but "the prosecution has the duty to memorialize the amendment by filing an amended complaint." *State v. Switzer*, 244 Kan. 449, 456, 769 P.2d 645 (1989); see also *State v. Nunn*, 244 Kan. 207, 768 P.2d 268 (1989) (recognizing memorialization may occur in a journal entry). The State's failure to comport with this duty "does not deprive a trial court of subject matter jurisdiction over the defendant," though such a failure may nonetheless constitute reversible error. *State v. Davis*, 283 Kan. 767, 769, 156 P.3d 665 (2007); see *Switzer*, 244 Kan. at 457 ("[T]he issue," when the State fails to amend the complaint in writing, "is whether the omission invalidates the verdict.").

To determine whether a failure to memorialize an oral amendment requires us to reverse a conviction, we examine (1) whether the amendment was appropriate—meaning no additional or different crime was charged and the substance of the amendment was not prejudicial, and (2) whether the failure to memorialize the amendment was prejudicial to the defendant. See *Davis*, 283 Kan. at 769 (explaining the court's use of the word "appropriate"); *Switzer*, 244 Kan. at 456-57 (discussing the additional consideration of whether prejudice results from the failure to memorialize the amendment and stating that failure to memorialize an amendment is not per se prejudicial and does not by itself constitute reversible error); see also *Nunn*, 244 Kan. at 224 (holding that an oral amendment is effective even without later memorialization, so long as the defendant is not prejudiced).

Applying these concepts in this case, we first conclude the information did not charge a new or different crime. Second, changing the underlying felony did not prejudice Dupree. The State's oral amendment only affected the felony-murder count by changing the underlying felony. And this change came as no surprise because Dupree had been charged with both underlying felonies, had defended against each, and his defense did not revolve around the nature of the underlying felony. In light of these circumstances, Dupree has failed to convince us that swapping the underlying felony for the felony-murder charge impaired his ability to defend himself or impaired his right to a fair trial. See K.S.A. 22-3201(e);

*Nunn*, 244 Kan. at 22526 (explaining that changing noncritical factors of an offense is not prejudicial).

So far we have considered the amendment itself. We must now consider whether the fact that the State did not follow up its oral amendment with a written amendment constitutes reversible error—that is, whether amendment *only* by oral motion prejudiced Dupree. See *Davis*, 283 Kan. at 769; *Switzer*, 244 Kan. at 456; *Nunn*, 244 Kan. at 224. We conclude it did not.

Dupree had notice of the amendment made on the record. See *Switzer*, 244 Kan. at 457. Further, substituting one underlying felony for another did not require any additional rewording of the charge, and Dupree does not claim the original charge for felony murder was not sufficiently specific. His arguments essentially boil down to a claim the State should have read the amended charge aloud from beginning to end, instead of just asking to swap out "aggravated robbery" for "aggravated burglary." Yet the effect of the State's amendment is clear and caused no confusion. Also, he was not, contrary to his argument, "left to guess" about how the jury instructions would be affected. Dupree participated in the jury charge conference and was able to see exactly how the amended charge played out. He had ample opportunity to object to any prejudice. We conclude the failure to memorialize the amendment did not cause prejudice.

Accordingly, we hold the State's oral amendment to the felony-murder charge, even though not memorialized, did not deprive the district court of jurisdiction or otherwise constitute reversible error.

ISSUE 3: *Sufficient evidence supports Dupree's felony-murder conviction.*

Dupree claims insufficient evidence supported his felony-murder conviction. He points out that while the amended information charged him with felony murder based on a killing that happened "while in the commission of, attempt to commit, or flight from" aggravated burglary, the jury instructions only asked the jury to consider whether Phillips was killed while Dupree "was committing" aggravated burglary. He contends aggravated burglary is not

"committed" until a perpetrator actually enters a building. Thus, Dupree argues the evidence was sufficient to establish only an "attempt to commit" aggravated burglary at the time of the murder because the evidence only established, at most, that he and Brown were *trying* to get into the Locust Street house (by pushing on the door or shooting through the door from the outside). In other words, according to Dupree, because the jury instructions theory only encompassed a completed burglary and not an attempted burglary there was insufficient evidence supporting his felony-murder conviction as charged.

Given that Dupree raises this issue as a sufficiency of the evidence claim, our standard of review is to "look[] at all the evidence in a light most favorable to the prosecution and determin[e] whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012). We "do not reweigh the evidence or evaluate the credibility of the witnesses," as this function is best left to the jury. *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011). Applying this standard, we reject Dupree's sufficiency challenge.

The felony-murder instruction required the jury to consider whether "[t]he killing was done while defendant was committing aggravated burglary." Granted, this was narrower than the charging information, as amended, which stated that Dupree and others killed Phillips "while in the commission of, attempt to commit, or flight from" aggravated burglary, language that mimicked the felony-murder statute. See K.S.A. 2015 Supp. 215402(a)(2) (defining felony murder as "the killing of a human being committed . . . in the commission of, attempt to commit, or flight from any inherently dangerous felony.").

Despite this deviation and the focus on whether the killing occurred while Dupree "was committing" aggravated burglary, we have previously explained: " 'The question for the jury is whether the death is within the res gestae of the crime, regardless of the actual sequence of events.' " *State v. Beach*, 275 Kan. 603, 610, 67 P.3d 121 (2003) (quoting *State v. Jacques*, 270 Kan. 173, 189-90, 14 P.3d 409 [2000]). And, with respect to felony murder, the res gestae includes "those acts done before, during, or after the hap-

pening of the principal occurrence when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence." *State v. Jackson*, 280 Kan. 541, 545, 124 P.3d 460 (2005).

Here, to determine whether Dupree "was committing" aggravated burglary when Phillips was shot, the jury could consider the moments immediately preceding the shooting, the moment of the shooting, and the moments immediately after the shooting, all of which fell within the res gestae of the felony murder in this case. Thus, it does not matter whether Phillips was shot during the scuffle to enter the home (which Dupree argues would only be an "attempt" to commit aggravated burglary) or once Dupree and Brown were over the threshold (which Dupree agrees would be a "committed" aggravated burglary) because the instruction permitted the jury to consider all these moments together as it determined whether a killing occurred while Dupree "was committing" aggravated burglary. Phillips' death occurred within the res gestae of felony murder, and the jury instruction reflected the facts of the case and did not run afoul of our precedent. See *Jackson*, 280 Kan. at 545; *Beach*, 275 Kan. at 610.

In fact, Dupree acknowledges that his attempt to distinguish between attempting to commit and committing a completed underlying felony is contrary to our precedent regarding res gestae. But he nonetheless urges us to set this precedent aside as inconsistent with legislative intent. He argues the three options in the felony-murder statute—a killing that occurred in the commission of, attempt to commit, or flight from any inherently dangerous felony—eliminate the res gestae concept and segment the nature of the State's proof.

Dupree is nominally correct because K.S.A. 2015 Supp. 21-5402(a) does set forth various circumstances in which the crime can occur. As we have stated:

"The felony-murder statute has two primary elements—killing and simultaneously engaging in an inherently dangerous felony. The second element can be established through proof that the killing occurred while the defendant was committing, attempting to commit, or fleeing from an inherently dangerous felony. These are simply factual circumstances in which a material element may be proven." *State v. Cheffen*, 297 Kan. 689, 702, 303 P.3d 1261 (2013).

In some felony-murder cases, there will be clear evidence that the death occurred after completion of the crime. See *State v. Kunellis*, 276 Kan. 461, 473, 78 P.3d 776 (2003). But at other times detailed sequences of events are unavailable, perhaps making it unclear when exactly the death occurred or the precise moment when actions crossed the line from attempt to completion. Still the evidence is sufficient so long as the acts happened so closely as to be part of the same occurrence—in other words, within the res gestae of felony murder. See, *e.g., Jackson*, 280 Kan. at 546 (affirming a jury's conclusion that a murder occurred "during" a drug transaction when the transaction "had not been completed but was still in process"); *State v. Kleypas*, 272 Kan. 894, 938, 40 P.3d 139 (2001) (describing the three statutory phrases as "temporal requirements delineating when a killing may occur and still be part of the underlying felony"), *overruled in part on other grounds State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004) . Nothing Dupree points to convinces us the language of the statute requires that the State must prove whether the killing *specifically* occurred once the intruders had crossed the threshold, as opposed to while they were committing the act of forcing their way into the home. Dupree fails to persuade us that the language of the felony-murder statute requires us to overrule our prior cases.

Here, the struggle at the door, the shot, and the entry happened so close together that they were all part of the same occurrence and within the res gestae. The evidence sufficiently supported the jury's finding that Phillips was killed while the men were committing aggravated burglary. Accordingly, we need not reach the parties' other arguments, and we hold there was sufficient evidence to support Dupree's felony-murder conviction.

ISSUE 4: *The jury instructions do not require reversal.*

We turn now to Dupree's three jury instruction arguments. We begin by discussing the steps of analysis that we apply when analyzing a claim of error arising from jury instructions. These steps are:

"'(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the

issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.'" *State v. BolzeSann*, 302 Kan. 198, 209, 352 P.3d 511 (2015) (quoting *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 [2012]).

Applying these steps to each of Dupree's three jury instruction issues, the parties focus on the second step, at which we determine whether there was any error at all by "'consider[ing] whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record.'" *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 (2013) (quoting *Williams*, 295 Kan. 506, Syl. ¶ 4); see also *State v. Plummer*, 295 Kan. 156, 16063, 283 P.3d 202 (2012) (setting forth a fourstep standard of review, in which this second step is split into two separate inquiries—was the instruction factually appropriate and was the instruction legally appropriate). We, too, will focus on the merits step and examine whether the instructions were factually and legally appropriate.

### 4.1. *The jury instructions did not result in an erroneous felony-murder conviction based on principal liability as opposed to aiding and abetting liability.*

Turning to the specifics of Dupree's first jury instruction issue, Dupree claims his felony-murder conviction must be reversed because the jury was not properly instructed about aiding and abetting liability. He believes the jury instructions precluded consideration of aiding and abetting liability for the felony-murder charge—meaning the jury could only have convicted him of felony murder as a principal. He further contends no evidence established he was the one who fired the gun and shot Phillips, and he also seems to imply the jury could not consider that he aided and abetted the aggravated burglary to the extent the commission of that crime was an element of felony murder, as charged. Therefore, he argues, the jury could not find him guilty of felony murder.

The aiding and abetting instruction at issue was given after both the State and Dupree proposed using PIK Crim. 4th 52.140, the pattern jury instruction explaining accomplice liability based on the theory of aiding and abetting. The district court proposed a

slight modification, beginning the instruction with the words "[a]s to Counts 2 to 7." As Dupree points out, this alteration effectively informed the jury that the instruction did not apply to the felony-murder count, which was Count 1.

Before turning to the merits of Dupree's arguments, we first briefly address his contention that we must rule in his favor because the State "invited error" by requesting the use of the pattern jury instruction on aiding and abetting, PIK Crim. 4th 52.140, and defending the district court's addition of the phrase limiting the instruction to Counts 2 through 7. But invited error is not a path to relief for the party making a claim of error in an appeal. Typically, unless the error is structural, invited error works to preclude appellate review of a claim of error if the party making the claim invited the error. See *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014); see also *State v. Hargrove*, 48 Kan. App. 2d 522, 531, 293 P.3d 787 (2013). Because Dupree is making the claim of error, not the State, the invited error doctrine is inapplicable.

Turning to Dupree's principal argument, we conclude it also lacks merit. Dupree argues the jury could not find him guilty of aiding and abetting felony murder if it followed the court's instructions. But he premises his argument on a fundamental misunderstanding of the nature of felony murder. If someone dies in the course of an inherently dangerous felony, such as aggravated burglary, "all the participants . . . [are] equally guilty of the felony murder, regardless of who fired the fatal shot." *State v. Thomas*, 239 Kan. 457, 462, 720 P.2d 1059 (1986). In short, all participants in a felony murder are principals. See *State v. Littlejohn*, 260 Kan. 821, 822, 925 P.2d 839 (1996); *Thomas*, 239 Kan. at 462.

If the evidence shows someone other than the defendant did the shooting, a district court may choose to issue a felony-murder instruction like the one given in this case, which requires the State to prove "the defendant, *or another*, killed [the victim]." See PIK Crim. 4th 54.120 & Notes on Use. Choosing to add "or another" so that the instruction more closely matches a particular factual scenario does not require the court to then also issue an aiding and abetting instruction specific to felony-murder. Indeed, this would be at odds with the nature of felony murder.

As to intent and participation in the underlying felony, it is enough that the instructions as a whole informed the jury about the nature of the defendant's liability for the underlying felony—in this case, Dupree's liability for the aggravated burglary. See *State v. Edgar*, 281 Kan. 47, 58, 127 P.3d 1016 (2006) ("[W]hen a homicide occurs during the commission of a felony, the '"felony is the statutory equivalent to the deliberation and premeditation essential to murder in the first degree."'" [quoting *State v. Altum*, 262 Kan. 733, 738, 941 P.2d 1348 [1997]). The district court instructed the jury on the elements of felony murder, as charged, which required the State to prove Phillips was killed in the commission of aggravated burglary. The instruction referred the jury to a separate instruction defining the elements of aggravated burglary. Specifically, to prove aggravated burglary, as charged, the State had to prove Dupree entered the Locust Street home without authority, he did so with the intent to commit aggravated robbery, and he did so while another person was in the house. In turn, the district court instructed the jury on the elements of aggravated robbery. The district court's instructions allowed the jury to consider whether Dupree aided and abetted the aggravated burglary.

While Dupree essentially reads the felony-murder instruction in isolation, the jury had to—and this court in reviewing his claim of error must also—consider the instructions as a whole. See *State v. Keel*, 302 Kan. 560, 570, 357 P.3d 251 (2015), *cert. denied* 136 S. Ct. 865 (2016) (directing that "instructions are to be considered together as a whole, without isolating any one instruction"). When read together, the jury instructions informed the jury that the aiding and abetting instruction applied to both the crimes of aggravated burglary and aggravated robbery—in other words, that it could convict Dupree of aggravated burglary and aggravated robbery based on aiding and abetting liability. If Dupree aided and abetted an aggravated burglary, and in the course of that aggravated burglary Brown shot Phillips, then Dupree may be convicted as a principal for felony murder. This theory is accurately reflected in the jury instructions as a whole.

We also note that the jury could well have concluded Dupree was guilty of the underlying felony of aggravated burglary as a prin-

cipal. See *State v. Gleason*, 277 Kan. 624, 633, 88 P.3d 218 (2004). Contrary to Dupree's assertion, there was more than sufficient evidence to support this theory: Stuart testified Dupree immediately stepped into the house after the shooting; asked her for money and her cell phone; pushed her through the house looking for a safe; threatened to kill her; and carried a television out of the house. Dupree admitted to taking a television and also admitted to accompanying Stuart and Brown throughout the house. While he denied threatening Stuart, pushing her, or acting of his own accord, the jury was free to disbelieve the parts of his story that did not correlate with Stuart's account. This evidence would permit a rational factfinder to conclude Dupree did not merely aid and abet an aggravated burglary but instead was an active and willing principal. We will not reweigh a jury's credibility determination. See *Hall*, 292 Kan. at 859.

Dupree also argues the problems with the jury instructions are illustrated by misstatements in the State's closing argument relating to his culpability for the acts of another. At issue is a portion of the argument where the prosecutor stated, "In for a penny, in for a pound." The State then recited the text of the court's aiding and abetting instruction and told the jury, "Now, don't get confused about the language here where it says as to Counts 2 through 7, when you're looking at Count 1, the felony murder. It's already built in. Go to . . . the felony murder [charge]." The State continued by noting Dupree had admitted that Brown killed Phillips and that the killing happened "while [Dupree] was committing an aggravated burglary. They're pushing their way into the house . . . . They're trying to get in." The State asserted it did not have to show Dupree intended to kill Phillips or that he knew Phillips would die; all it had to show was that the men were committing an inherently dangerous felony, Dupree was involved in it, and a person died.

This argument, rather than pointing out a problem with the instructions, illustrates how the instructions, when read as a whole, correctly reflected Kansas law and fully explained the theory of accomplice liability relevant to the facts of Dupree's case. Liability for felony murder does not distinguish between principals and aiders and abettors, and the felony-murder instruction explained this

through the use of the phrase "the defendant or another." The State also accurately informed the jury that the foreseeability portion of the aiding and abetting instruction—that a person is responsible not only for the crime he intentionally aided and abetted but also for reasonably foreseeable crimes and consequences that might happen during the course of the intended crime—was built into the felony-murder instruction. The instructions referred the jury to the instruction for aggravated burglary, which in turn referred the jury to the instruction for aggravated robbery. And they informed the jury that Dupree had to intend to commit—or aid and abet the commission of—these crimes. The prosecutor's arguments did not tell the jury to ignore these requirements or direct them away from considering any element of the underlying crimes.

We therefore reject Dupree's first jury instruction argument. The instructions regarding felony murder, aggravated robbery, and aiding and abetting properly and fairly stated the law as applied to the facts of his case. Because we find no error, we need not discuss the other steps of the jury instruction analysis. See *Williams*, 295 Kan. at 518.

### 4.2. *The district court did not commit reversible error by declining to instruct the jury on Dupree's requested compulsion defense.*

In Dupree's next claim of jury instruction error, he contends the evidence at trial, taken in the light most favorable to him, supported a compulsion defense. He argues there was evidence that Brown pointed a gun at him and directed him into and around the Locust Street home. Accordingly, he contends, the district court erred as a matter of law in rejecting his request for such an instruction.

The compulsion defense is defined in K.S.A. 2015 Supp. 21-5206(a), which provides:

"A [defendant] is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which [he or she] performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if [the defendant] reasonably believes that death or great bodily harm will be inflicted upon [him or her] or upon [his or her family] if [he or she] does not perform such conduct."

The compulsion defense "is not available to a person who intentionally or recklessly places such person's self in a situation in which such person will be subjected to compulsion or threat." K.S.A. 2015 Supp. 21-5206(b).

As to the first part of the statute making the defense unavailable to defendants accused of "murder or voluntary manslaughter," this court has explained this phrase means murders resulting from an intentional killing. See *State v. Hunter*, 241 Kan. 629, 641, 740 P.2d 559 (1987) ("The rationale is that, when confronted by a choice between two evils of equal magnitude, the individual ought to sacrifice his own life rather than escape by the murder of an innocent."). But a defendant may raise a compulsion defense if he or she is charged with a killing "done by another during the commission of some lesser felony," so long as compulsion is an available defense for that underlying felony. *Hunter*, 241 Kan. at 641-42.

Hence, the compulsion was legally available to Dupree as a defense to the felony-murder charge. Even so, the district court had to determine whether the evidence supported the instruction—that is, whether the instruction was factually appropriate. See *Herbel*, 296 Kan. at 1121. Generally, a criminal defendant is entitled to instructions on the law applicable to his or her theory of defense if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. *State v. Hilt*, 299 Kan. 176, 184, 322 P.3d 367 (2014). If the defendant requested an instruction at trial, as Dupree did, the court must view the evidence in the light most favorable to the defendant, 299 Kan. at 184, and can find the evidence sufficient even if a defendant's testimony was all that supported the defense. *State v. Anderson*, 287 Kan. 325, 334, 197 P.3d 409 (2008).

In making this assessment, the district court had to consider the limited nature of the compulsion defense. *State v. Dunn*, 243 Kan. 414, 421, 758 P.2d 718 (1988). Specifically, a compulsion defense is only available if "the coercion or duress [was] present, imminent, and impending, and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act [was] not done." 243 Kan. at 421; see also *State v. Matson*, 260 Kan. 366, 385, 921 P.2d 790 (1996) ("A threat of future injury is not enough."). The

coercion or compulsion must also be continuous, and a defendant cannot invoke the defense if there was a reasonable opportunity to avoid committing the crime without undue exposure to death or great bodily harm. *Dunn,* 243 Kan. at 421; see *State v. Baker,* 287 Kan. 345, 352, 197 P.3d 421 (2008).

Considering these requirements, a district court must evaluate whether a rational juror could conclude that the defendant *reasonably* believed he or she was in danger of death or great bodily harm, see K.S.A. 2015 Supp. 21-5206, and whether coercion induced a *well-grounded* fear, see *Dunn,* 243 Kan. at 421. "[M]erely 'slight' evidence of these objective standards of reasonableness would appear to be insufficient to justify a rational factfinder finding for the defendant, and therefore insufficient to warrant the giving of a compulsion instruction." *Anderson,* 287 Kan. at 334.

Here, the district court determined there was not enough evidence to permit a rational jury to believe Dupree's compulsion defense. See *Anderson,* 287 Kan. at 334. Thus, it denied Dupree's request for such an instruction.

Dupree argues the district court erred in making this ruling because four portions of his trial testimony supported a compulsion defense instruction: (1) Dupree's testimony he was walking away from the Locust Street home when, after hearing a pop, Brown waved a gun at Dupree and indicated he should follow inside; (2) Dupree's testimony that when he hesitated at the threshold, Brown again waved the gun and told him to come on; (3) his testimony that he stayed close to Brown inside the house because he did not know what was going on and felt his life was in danger; and (4) his testimony that he helped steal the televisions because Brown told him to stop standing around and help and because he did not want anything else to go wrong.

While Dupree's testimony represents some slight evidence of duress, his testimony is not sufficient to entitle him to a compulsion defense instruction. See *Anderson,* 287 Kan. at 334. In fact, Dupree's own testimony on crossexamination negated his compulsion defense. Dupree admitted that he could have fled the scene after the shooting, and, though he explained he did not flee because he was shocked and scared for his life, he also admitted that Brown

did not verbally threaten him. Dupree also acknowledged Brown was not in the same part of the house or threatening him when he took the television from the living room and went outside. Again, a compulsion defense is only available when coercion was continuous and there was no reasonable opportunity for the defendant to escape the scene without committing the charged crimes. See *Dunn*, 243 Kan. at 421.

Thus, even Dupree's own testimony, considered in the light most favorable to him, does not provide evidence sufficient to support his request for an instruction regarding the compulsion defense. See *Anderson*, 287 Kan. at 334. The district court's assessment that the instruction was not warranted is further bolstered by the testimony of Stuart and other witnesses who had been around Dupree and his accomplices before and after the events at the Locust Street house. Considering all this evidence, a rational jury could not find that Dupree reasonably believed he was in danger of death, that this fear was wellgrounded, or that the compulsion was continuous and left Dupree with no reasonable opportunity to escape the compulsion or avoid the act. See *Anderson*, 287 Kan. at 334. Accordingly, we hold the district court did not err in concluding Dupree's requested instruction on compulsion was not factually warranted.

### 4.3. *The district court did not err in failing to give a lesser included offense instruction for the felony-murder charge.*

Dupree's third and final jury instruction argument is that the district court committed reversible error in rejecting his request to instruct the jury about lesser included offenses for felony murder—specifically, the lesser included offenses of second-degree intentional murder and voluntary manslaughter. He urges us to conclude the jury could well have convicted him of a lesser included offense, and he points to evidence he believes shows the victim, Phillips, was the aggressor prior to the shooting.

At the time of Dupree's trial, Kansas law held that lesser included offense instructions must be given, even in felony-murder cases, when there was some evidence that would reasonably justify a conviction of a lesser included crime. *State v. Berry*, 292 Kan. 493, 254

P.3d 1276 (2011), *superseded by statute as recognized in State v. Todd*, 299 Kan. 263, 273-74, 323 P.3d 829 (2014).

However, after our opinion in *Berry* the legislature eliminated all lesser included offenses of felony murder. See K.S.A. 2013 Supp. 21-5109; L. 2012, ch. 157, sec. 2; see *Todd*, 299 Kan. at 274. Although K.S.A. 2013 Supp. 21-5109 was effective July 1, 2013— after Dupree's trial—the legislature expressly provided that the statute is a procedural rule meant to apply retroactively to any case currently pending. See K.S.A. 2013 Supp. 21-5402(d), (e), L. 2013, ch. 96, sec. 2; see *Todd*, 299 Kan. at 274-75. We have since held that this last prescription was within the legislature's powers and did not violate the Ex Post Facto Clause. *Todd*, 299 Kan. at 276-78.

With this recent legislative history in mind, we readily agree with the State that Dupree's argument lacks merit. The legislature has made clear that (1) felony murder has no lesser included offenses and (2) this rule applies retroactively to all cases pending, which would include Dupree's case. See *Todd*, 299 Kan. at 276-78. Dupree's requested lesser included offense instructions were legally inappropriate. Likewise, the district court did not err in refusing to issue such instructions. See *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 (2013).

ISSUE 5: *The district court's order permitting the case detective to sit at or near counsel table during trial, and its decision to exempt the case detective from a sequestration order, did not prejudice Dupree and do not require reversal.*

Dupree argues the district court abused its discretion in allowing the case detective to sit with the State's attorneys at or near the prosecution's table and also abused its discretion by permitting the case detective to remain in the courtroom despite the general sequestration order. He asserts the case detective's presence and testimony unfairly bolstered the State's case and amounted to a constitutional error requiring reversal of his convictions.

Prior to trial Dupree had moved for an order of sequestration and specifically requested the order cover the case detective— meaning she, like all other witnesses, would not be permitted to hear any other person's testimony. Dupree's motion also stated that

even though it might not be per se abuse of the district court's discretion to allow a case detective to sit at counsel table during trial, it nonetheless opened the door to possible prejudice.

The State responded by noting it was the general practice in Sedgwick County to permit detectives to remain in the courtroom despite a sequestration order. But on Dupree's second point, the State agreed—it assured the district court it would not place the case detective at counsel table. Instead, she would sit behind counsel but still assist the State.

The district court entered a sequestration order but exempted the case detective from its order. It also specifically ruled the case detective would be permitted to sit near the prosecutor. In the course of its ruling the district court stated it had "always been [its] practice over the years to allow the case detective to sit at the table or in close proximity to the prosecutor," and it "[had not] been made aware of a case that stands for the proposition that it is definitely prejudicial and [should not] be allowed." The State again confirmed it was not intending to have the case detective sit at counsel table and explained there was not enough room at the counsel table anyway. Instead, the State explained, it would probably have the case detective sit in front of the barrister bar but behind the counsel table.

With these facts in mind, we will separately consider the two aspects of Dupree's argument: (1) whether the district court erred in allowing the case detective to sit with counsel and (2) whether the district court erred in exempting her from the sequestration order.

As to the first aspect, in *State v. Sampson*, 297 Kan. 288, 292, 301 P.3d 276 (2013), which was filed after the trial in this case, we acknowledged that our previous caselaw allowed a district court some discretion to allow a testifying law enforcement officer to sit at the prosecution table. See *State v. Kirkpatrick*, 286 Kan. 329, 342-43, 184 P.3d 274 (2008), *abrogated by Sampson*, 297 Kan. 288. But we abrogated this rule in *Sampson* and held that permitting a case detective to sit at counsel table carried a significant likelihood the detective's credibility would be improperly bolstered. *Sampson*, 297 Kan. at 295-96. Accordingly, post-*Sampson*, "a trial court has no discretion to permit a testifying law enforcement officer to

sit at the prosecution table, regardless of the practical benefits of that practice to the prosecution." 297 Kan. at 297.

That post-*Sampson* holding does not apply to this case, which preceded the filing of *Sampson*. Nevertheless, the reasoning of *Sampson* supports Dupree's arguments as to why the district court abused its discretion in permitting the case detective to sit nearby and assist the prosecutor. Indeed, in *Sampson*, 297 Kan. at 296-97, we identified the harm as the significant likelihood a detective's credibility would be improperly bolstered by permitting an officer to be so visually associated with the State's lawyers. This danger exists even if the case detective sits behind the counsel table but in front of the barrister bar, as apparently happened here.

We also specifically stated in *Sampson* that the "practical benefits" of having a case detective handy are simply not more important than the need to avoid improper credibility vouching by the State. 297 Kan. at 297. And we are thus troubled by the State's explanation, to the district court, that the case detective would assist the State in gathering documents and answering questions the prosecutors might have about the case. This type of conduct unquestionably adds an imprimatur of credibility to the case detective's testimony that will in many cases be inappropriate. See 297 Kan. at 296 (noting that the case detective in that case "acted as a legal assistant, rose four times from the table to testify, and returned four times to the table"). It is well established the State may not assert to the jury a certain witness is or is not truthful. Working with and openly relying upon a case detective throughout trial communicates trust and veracity. See *State v. Elnicki*, 279 Kan. 47, 64, 105 P.3d 1222 (2005) ("[A] prosecutor should not comment on the credibility of his or her own witnesses.").

The State counters, however, that before *Sampson* the practice was still allowed and nothing suggests this case differs in kind from those past cases. This may be valid. Regardless, even assuming an abuse of discretion here, the assumed error was harmless. Dupree asserts, without analysis, that we must apply the constitutional harmless error standard. Under this standard,

"the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not

affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967]).

Assuming this standard controls, we conclude the State has met its burden in light of the overwhelming evidence against Dupree and the fact that the case detective's testimony had little, if anything, to do with Dupree's defense. The bulk of the case detective's testimony consisted of a summary of the police investigation, direct evidence of her own interactions with Stuart, and a narration of the video from the security camera located near the Locust Street house. Some of her testimony was helpful to the defense, such as her statements that no DNA or fingerprint evidence was found and her statement that Dupree was not hiding and was peaceably arrested. And, unlike in some cases, Dupree did not attack the credibility of the case detective because the case detective's testimony was not the disputed evidence in the trial.

Stuart was the main witness against Dupree, and she told the jury about his personal involvement and his culpability for the crimes. Other witnesses, too, implicated him in the crimes. Even Dupree's testimony tracked Stuart's version of events, only differing on the matter of his intent—*i.e.*, he claimed he was an unwilling actor. Like Stuart, Dupree subjected himself to the jury's credibility evaluation by testifying, and the jury apparently rejected his testimony about being sick and not acting of his own free will—a theory rebuffed by several fact witnesses and his own answers on cross-examination. The case detective's testimony had little bearing on that point. Hence, we do not believe there is any reasonable possibility the result would have changed if the case detective had not been sitting near the prosecutor's table.

For the same reasons, even if we assume the district court abused its decision when it exempted the case detective from the sequestration order, considering the record as a whole, we cannot conclude the case detective's presence prejudiced Dupree. Dupree points to no indication in the record of prejudice and makes no suggestion, for example, that the case detective tailored her tes-

timony to buttress or to rebut another witness' testimony. See *State v. Heath*, 264 Kan. 557, 589, 957 P.2d 449 (1998) (recognizing that even if district court abuses its discretion in denying a request to sequester witnesses, the error is not reversible absent evidence of prejudice).

We conclude the district court's orders regarding the sequestration and seating of the case detective do not require us to reverse Dupree's convictions.

ISSUE 6: *The cumulative error doctrine does not require reversal of Dupree's convictions.*

In his final argument, Dupree argues all of the alleged errors discussed above, when considered together, deprived him of a fair trial.

"Cumulative trial errors, when considered collectively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial." *State v. Waller*, 299 Kan. 707, 72728, 328 P.3d 1111 (2014). We will not find cumulative error "when the record fails to support the errors raised on appeal." *State v. Cofield*, 288 Kan. 367, 387, 203 P.3d 1261 (2009). A single error will not constitute cumulative error. *State v. Foster*, 290 Kan. 696, 726, 233 P.3d 265 (2010).

As we have explained above, each of Dupree's claims fails individually; at most, we have assumed error in the orders regarding the case detective but have determined that this assumed error did not prejudice Dupree. There are no other errors to accumulate, and the cumulative error doctrine does not apply. See *Foster*, 290 Kan. at 726.

## CONCLUSION

For the foregoing reasons, we affirm each of Dupree's convictions and sentences.

Affirmed.