NOT DESIGNATED FOR PUBLICATION

No. 114,598

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LUIS D. READDY,
*Appellee*,

v.

KANSAS DEPARTMENT OF REVENUE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; SETH L. RUNDLE, judge. Opinion filed September 1, 2017. Affirmed.

*J. Brian Cox*, deputy general counsel, of Legal Services Bureau, Kansas Department of Revenue, for appellant.

No appearance by appellee.

Before BRUNS, P.J., MCANANY and BUSER, JJ.

BUSER, J.: The Kansas Department of Revenue (KDOR) appeals from the district court's decision to set aside the administrative suspension of Luis D. Readdy's driving privileges following a de novo trial. On appeal, KDOR contends that the district court erred in concluding that the law enforcement officer who stopped Readdy for a traffic violation lacked reasonable grounds to believe that he was operating a vehicle while under the influence of alcohol. Although we may not have reached the same conclusion as the district court, we find that there was sufficient evidence presented at trial to support the district court's conclusion. Thus, we affirm.

1

A Kansas Highway Patrol Master Trooper filed an Officer's Certification and Notice of Suspension—known as a DC-27 form—stating that he had reasonable grounds to believe that Readdy operated a motor vehicle under the influence of alcohol on July 19, 2014. The Trooper indicated on the form that he stopped Readdy for speeding and for an unsafe lane change. In addition, the Trooper indicated on the DC-27 that Readdy refused to submit to testing. The form also reflected that the Trooper believed Readdy was driving under the influence based on: (1) odor of alcoholic beverages, (2) failed sobriety tests, (3) bloodshot eyes, (4) difficulty in communicating, (5) poor balance or coordination, (6) admitted alcohol consumption, and (7) failed preliminary breath test (PBT).

An administrative hearing officer upheld the suspension, and Readdy filed a petition for judicial review in district court. The district court subsequently held a trial de novo at which the Trooper and Readdy both testified. In addition, the district court watched a video of the encounter between the Trooper and Readdy.

The Trooper testified that as he merged onto U.S. Highway 54 westbound in Wichita, he saw a vehicle "in the inside lane [that] was obviously traveling well in excess of the speed limit . . . ." Consequently, the Trooper activated his rear antenna radar, which indicated the vehicle was traveling 99 to 100 miles per hour. According to the Trooper, the speed limit at that location was 60 miles per hour.

The Trooper then observed the speeding vehicle "move from the far left lane all the way to the exit lane to Grove Street in one continuous motion." In doing so, the vehicle passed in front of two other cars on U.S. 54 behind the Trooper's vehicle. The Trooper did not consider this maneuver to be a safe change of lanes, and he noted that the vehicle did not use its turn signals. After the vehicle passed behind his patrol car and

2

exited the highway, the Trooper drove through the grass and pulled up behind the erratically driven vehicle.

As the Trooper followed the vehicle, he observed it stop at the end of the exit ramp, signal, and make a left turn onto Grove Street. At that point, the Trooper initiated a traffic stop. The Trooper testified that the driver—ultimately identified as Readdy—did not react promptly to his emergency equipment. Once the vehicle stopped and the Trooper made contact with Readdy, he noticed that Readdy's eyes were "watery and bloodshot" and he detected the odor of alcohol coming from the vehicle. At some point during the stop, the Trooper also smelled the odor of alcohol on Readdy's breath.

When asked if he had consumed any alcohol, Readdy responded that "it had been one or two nights since his last drink." The Trooper then asked him why he could smell alcohol on Readdy's breath. In response, Readdy stated that he had not consumed an alcoholic beverage for "two nights." The Trooper suspected that Readdy was being untruthful because he "could still smell the odor of alcohol on his breath . . . ."

On cross-examination, the Trooper acknowledged that he marked the box on the DC-27 form that indicated the driver admitted to having consumed alcohol or drugs. He explained that the DC-27 form does not contain any provision specifying any period within which the alcohol must be previously consumed. "So if somebody tells me . . . I had something to drink two days ago, that's still an admission." Even though he recognized that drinking alcohol 2 days earlier would not have affected Readdy's ability to drive at the time of the stop, the Trooper considered this admission when determining whether he had reasonable grounds to arrest Readdy.

The Trooper described Readdy's attitude and demeanor as "fairly argumentative at times." During cross-examination, however, the Trooper acknowledged that when he filled out a report within a few days of the traffic stop, he completed the "attitudes and

3

actions" section by marking the "cooperative" box. He did not indicate any abusive, antagonistic, or combative behavior on Readdy's part.

According to the Trooper, Readdy also exhibited some difficulty in his ability to communicate. Although he did not notice any slurred speech, the Trooper testified that Readdy had transposed a couple of numbers in his zip code and had initially said he was headed home even though he was going in the wrong direction. When confronted with this fact, Readdy changed his story. Moreover, while Readdy was perusing a stack of paperwork attempting to find his insurance information, the Trooper noticed that "his fingers appeared clumsy" and he was not "precisely manipulating the paperwork."

Based on this encounter, the Trooper determined that it was appropriate to ask Readdy to conduct field sobriety testing. The Trooper reported that Readdy showed four out of the eight clues for possible intoxication on the walk-and-turn test. At trial, he testified that Readdy actually exhibited five clues on the test. The Trooper also stated that Readdy failed the one-leg stand by exhibiting three out of four clues of possible intoxication.

When the Trooper asked Readdy to submit to a PBT, he agreed to do so. But the Trooper testified that Readdy did not follow directions, making the otherwise easy process "fairly difficult." In fact, the Trooper suggested that Readdy was "trying to deceive [him]" because he acted in a manner similar to individuals that are "trying to give the appearance that they're trying to comply with the test but not actually give a good breath sample." Nevertheless, the Trooper testified that that Readdy eventually provided a good breath sample.

The Trooper indicated that the PBT displayed error code "E-31" rather than Readdy's breath alcohol content. Because he was unfamiliar with this error code, the Trooper looked it up in his manual and read that "E-31" is an indication that the "result is

4

over range, so it's above the range that the instrument can accurately measure." As such, the Trooper believed that Readdy had a breath alcohol content of .44 or higher. The Trooper admitted, however, that Readdy did not act like someone with such a high alcohol content and agreed that a person with such at such a high level "should be either comatose or dead."

In his testimony, Readdy admitted that he was speeding before being stopped by the Trooper, but he claimed that he was only traveling at a speed between 70 to 72 miles per hour. According to Readdy, he was not argumentative with the Trooper during the stop. Instead, he testified that he was "just being himself" and only attempted to defend his civil liberties. With respect his admission to his recent alcohol consumption, Readdy believed that he told the Trooper that he had consumed three drinks, but that the Trooper did not allow him to explain when he consumed the drinks. On cross-examination, Readdy admitted that in response to the State's pretrial interrogatories that he responded that he had consumed three beers in the 8 hours prior to the traffic stop; at the hearing, however, Readdy only claimed that he only consumed a sip of the third beer.

With respect to the field sobriety testing, Readdy claimed that he was able to complete the walk-and-turn test other than turning to the right—rather than to the left—because the Trooper failed to properly instruct him. He also claimed that on the heel-to-toe test that he was "pretty there" and was "walking erect." Likewise, when asked about his performance on the one-leg stand, Readdy explained that he "had to just put [his] toe [down] for a little bit, but after that I think I did okay, in my opinion.

After hearing the testimony, reviewing the video, and considering the arguments of counsel, the district court set aside the administrative order of suspension. The district court concluded that based on the totality of the circumstances, the Trooper did not have reasonable grounds to arrest Readdy for DUI. In reaching this conclusion, the district judge reasoned:

5

"I want to make clear that nothing that I'm going to say . . . is in any way intended to be a reflection on what I believe about the integrity or veracity of [the Trooper]. I did not believe at any point that he was [attempting] to be in any way less than one hundred percent honest in everything that he said and testified to.

.  .  .  .

"And . . . I, when I watched the videos, made a note of what exactly was said by the trooper when he finally, on the fifth attempt, got a sufficient or a valid sample with the [PBT] device. And it was at about minute 30 and 13 seconds when he said to his fellow master trooper, 'Let me look something up real quick.' It was nearly four minutes later when he states on the video, 'The instrument showed me an error message. You're over the range for the instrument.'

"There was no discussion of what that level would be, but we had testimony that the range of the instrument was .44 and the officer testified that in his experience he would, apparently, be disinclined to believe that [Readdy] was, in fact, anywhere near that blood alcohol content. And I question whether, as a matter of law, a[n] error message constitutes a failed preliminary breath test and I'm going to find that it does not.

"I also had paid careful attention to the conversation on the video, in light of the testimony, about when Mr. Readdy said he had consumed alcohol. And it was—I believe the sum total of the evidence is just what was on the video as confirmed by the master trooper that Mr. Readdy initially said he had had something to drink one or two nights ago.

.  .  .  .

"And based on that recorded conversation . . . the trooper indicated the person stated alcohol or drugs consumed. And those two together cause me to question the reasonableness—not the veracity, but the reasonableness of his conclusion. I just—I cannot find that based on what Mr. Readdy said that he, in fact, admitted having consumed alcohol at any time that would have been relevant to this traffic stop.

6

. . . .

"And I also don't think that it was reasonable for him to interpret an error message as a failed [PBT]. So . . . I don't think that those apply as being—I think [Readdy] has essentially disproven those as potential grounds for reasonable belief.

"That leaves me with odor of alcohol beverages, failed field sobriety tests, bloodshot eyes, difficulty in communicating, poor balance or coordination. And out of those, having watched the videos from Mr. Readdy's exit of the vehicle, to the FSTs and his moving from the back of his vehicle up to the trooper's vehicle, I didn't see a single thing that led me to believe that he had poor balance or coordination, but we did have testimony that he had difficulty manipulating papers in his vehicle.

"And the frustrating thing for the Court here is that every single thing that I would be interested in being able to confirm on the video, since I don't find the reasonableness on the last two boxes, I can't confirm with the video. . . .

. . . .

"I listened to the video. I didn't understand—or I didn't see that there was any difficulty in communicating, and, in fact, my observation about Mr. Readdy's speech was that he was pretty much exactly the same person on the stand as—that he was on the video, including being fairly abrasive and combative and argumentative.

. . . .

"And my question now is whether what's left is sufficient to find that it was reasonable grounds . . . .

"But based on the—what, apparently, happened, we've got a guy who's going extremely fast and probably driving recklessly, not just speeding but reckless driving at that point, but—just based on the speed and, apparently, is able to maneuver . . . through other cars without striking them and then exit the highway at which point the video starts. So I almost question whether the rate of speed that he's supposed to be going doesn't go

7

the other way, that he's able to maintain control of the vehicle without striking anything, but . . . I don't know, I think it could go both ways.

"But where the video picks up all I have is what [Readdy]'s counsel urged is driving smack down the middle of his lane, stopping on the stop line at the stop sign, signaling his turn appropriate[ly], waiting for the car to go by. And then once the trooper's lights come on, as he makes the turn, he makes another appropriate lane change and pulls over to the side of the road.

. . . .

"So I—ultimately, I think I am going to find that [Readdy] has met his burden of proving the lack of reasonableness for the arrest based on the totality of the circumstances, including what I'm able to see on the video, the demeanor of—well, the physical movements and demeanor and speech of Mr. Readdy from when he exits the vehicle about two minutes into it, up until 20 minutes later, all of which time he's standing in full view of the camera."

After the district court stated its decision, KDOR's attorney asked the court to also find that Readdy "failed both field sobriety tests." Instead, the district court found that it "disagree[d] that this trooper reasonably concluded that Mr. Readdy failed the preliminary field sobriety [or] the preliminary PBT" and further "disagree[d] with [the Trooper's conclusion] that Mr. Readdy had consumed alcohol and admitted it. . . ." In a minute sheet prepared shortly after the trial, the district court found that Readdy had met his burden to prove that there was "no reasonable grounds for arrest." The district court subsequently entered a Journal Entry in which it incorporated its decision from the bench and concluded "that the officer lacked reasonable grounds to request testing."

Thereafter, the State timely appealed.

ANALYSIS

The Kansas Judicial Review Act (KJRA) defines the scope of judicial review of state agency actions. K.S.A. 2016 Supp. 77-603(a); see *Ryser v. Kansas Bd. of Healing Arts*, 295 Kan. 452, 458, 284 P.3d 337 (2012). Appeals from administrative suspensions of drivers' licenses are subject to review under the KJRA except that appeals to the district court are de novo. K.S.A. 2016 Supp. 8-259(a); see *Moser v. Kansas Dept. of Revenue*, 289 Kan. 513, 516-17, 213 P.3d 1061 (2009). On appeal, the burden of proving the invalidity of the agency action rests on the party—in this case KDOR—asserting such invalidity. K.S.A. 2016 Supp. 77-621(a)(1).

Here, we must determine whether the district court's findings are supported by evidence that is substantial when viewed in light of the record as a whole. See K.S.A. 2016 Supp. 77-621(c)(7), (d); *Swank v. Kansas Dept. of Revenue*, 294 Kan. 871, 881, 281 P.3d 135 (2012). Substantial competent evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014). In evaluating the evidence presented at trial, we do not weigh conflicting evidence nor do we reevaluate the credibility of witnesses. *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009).

On appeal, KDOR contends that the district court erred in reversing the suspension of Readdy's driving privileges. KDOR asserts that the evidence presented at the trial shows that the Trooper had reasonable grounds to believe Readdy was operating a vehicle while under the influence of alcohol. According to KDOR, the district court "flyspecked individual pieces of evidence, improperly required corroboration of the Trooper's testimony, and failed to give due account to the uncontroverted evidence. . . ." Specifically, KDOR points to evidence of reckless driving, odor of alcohol, bloodshot or watery eyes, deception as to alcohol consumption, confusion, fine motor skill deficits, an argumentative attitude, and a failing performance on field sobriety tests.

9

K.S.A. 2016 Supp. 8-1001(b) authorizes law enforcement officers to request blood alcohol testing if the officer has reasonable grounds to believe the driver was operating a vehicle while under the influence of alcohol or drugs and the officer arrests or takes the person into custody for any offense involving driving under the influence. "Reasonable grounds" under the Implied Consent Law is analogous to "probable cause." See *Sloop v. Kansas Dept. of Revenue*, 296 Kan. 13, Syl. ¶¶ 3-4, 290 P.3d 555 (2012). "Probable cause to arrest is the reasonable belief, drawn from the totality of information and reasonable inferences available to the arresting officer, that the defendant has committed or is committing a specific crime." *State v. Johnson*, 297 Kan. 210, 222, 301 P.3d 287 (2013).

Accordingly, we must determine whether the district court erred as a matter of law or abused its discretion in weighing the evidence. See *State v. Dupree*, 304 Kan. 377, 389, 373 P.3d 811 (2016). Although the district court did not find the Trooper in this case to lack credibility, it found several of his conclusions to be unreasonable based on the testimony at the hearing and a review of the video of the traffic stop. In particular, the district court focused on the Trooper's unreasonable conclusions that the error message on the breath testing instrument meant that Readdy's alcohol content was .44 or over and Readdy's statement that he had consumed alcohol one or two nights ago as being an admission that he consumed alcohol at any time relevant to the traffic stop.

Based on the district court's review of the video, it could not see anything to lead it to conclude that Readdy had poor balance or coordination. In fact, the district court noted that it could not confirm any of the Trooper's conclusions regarding Readdy's failure to properly perform field sobriety tests. The district court further determined that there was nothing on the video—as compared to Readdy's in-court testimony—to support the conclusion that he had difficulty in communicating. The district court also found no evidence of red or bloodshot eyes.

10

The district court found that it was possible—based on the Trooper's testimony—that Readdy was travelling "extremely fast and probably driving recklessly" but that he was nonetheless able to move through traffic without striking other vehicles and then exit the highway. According to the district court, the video shows Readdy driving appropriately after leaving the highway. The district court further concluded that "once the trooper's lights come on, as he makes the turn, he makes another appropriate lane change and pulls over to the side of the road." We note that although we may interpret the video somewhat differently, the district court's observations are reasonable and, thus, based on substantial evidence.

As a result, we do not find that the district court erred as a matter of law. Moreover, we conclude that the district court's factual findings are supported by evidence that is substantial when viewed in light of the record as a whole. In particular, the district court carefully weighed the testimony presented at trial against the video of the traffic stop. After doing so, the district court rendered factual findings that were based on reasonable inferences drawn from the evidence. We, therefore, will not replace our judgment for that of the district court, and we affirm its decision to set aside the administrative suspension of Readdy's driving privileges.

Affirmed.