NOT DESIGNATED FOR PUBLICATION

No. 114,818

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRIAN O'NEAL WATSON,
*Appellant*.


MEMORANDUM OPINION

Appeal from Johnson District Court; TIMOTHY P. MCCARTHY, judge. Opinion filed May 26, 2017. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., MCANANY, J., and HEBERT, S.J.

*Per Curiam*: Brian O'Neal Watson appeals from his conviction by a jury of attempted second-degree murder and level 4 aggravated battery. He argues he should have a new trial because: (1) he was excluded from the courtroom while the jury listened to the recording of his 911 call during their deliberations, and the prosecutor's trial assistant was allowed to play the recording for the jury; (2) jurors were observed dozing off and sleeping during his trial; (3) the prosecutor committed error in closing argument; (4) the trial court erroneously denied his requested instructions on lesser included offenses under the aggravated battery charge; (5) the trial court presented a clearly erroneous instruction to the jury; and (6) cumulative error deprived him of a fair trial.

1

We have examined each of these arguments and find no reversible error. Watson's convictions are affirmed.

*Factual and Procedural Background*

On July 14, 2014, Watson was charged in an amended complaint with attempted first-degree murder and aggravated battery by knowingly causing great bodily harm or disfigurement, a level 4 person felony, after he hit Erica Cooper in the head with a 20-pound dumbbell. A jury trial was held in July 2015. Watson was convicted of the lesser included offense of attempted second-degree murder and aggravated battery as charged.

On August 4, 2015, Watson's attorney filed a motion for new trial pursuant to K.S.A. 22-3501. He argued a new trial was warranted because: (1) multiple jurors were noticeably sleeping during trial; (2) an employee of the District Attorney's Office was in the courtroom with the jury during deliberations while Watson and his attorney were not present; (3) the State's attorney violated the court's pretrial restrictions by approaching the jury box, banging the bloody dumbbell on the rail separating the jury and courtroom, and then left the dumbbell there during her rebuttal; (4) the burden of proof instruction did not clearly explain "beyond a reasonable doubt," so the court should have used Watson's requested instruction; (5) cumulative trial error denied Watson his right to a fair trial; and (6) the State failed to prove Watson guilty beyond a reasonable doubt. On August 13, 2015, Watson also filed a pro se motion for new trial.

On September 16, 2015, the trial judge addressed and denied Watson's motions. Watson filed a timely notice of appeal. The pertinent factual circumstances will be set forth in the discussion of each of the issues raised by Watson in his appeal.

*The trial court did not err in denying Watson's motion for new trial.*

An appellate court reviews the district court's decision on a motion for new trial for an abuse of discretion. *State v. Holt*, 298 Kan. 469, 473, 313 P.3d 826 (2013). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). The party asserting the trial court abused its discretion bears the burden of showing such abuse of discretion. *State v. Robinson*, 303 Kan. 11, 90, 363 P.3d 875 (2015), *cert. denied* 137 S. Ct. 164 (2016).

*Listening to the 911 Call During Deliberations*

Watson first argues that he had a right to be present when the jury reconvened in the courtroom during deliberations to listen to the recording of his 911 call. In the alternative, he argues the State's trial assistant should have not been in the room to operate the computer on which the evidence was contained. In essence, he is arguing that the trial court abused its discretion based on an error of law, a question over which we exercise unlimited review. See *State v. Herbel,* 296 Kan. 1101, 1106-07, 299 P.3d 292 (2013). The State counters that under K.S.A. 2016 Supp. 22-3420(c) and the caselaw developed from that statute, Watson did not have a right to be present while the jury listened to the 911 call during deliberations, and, in any event, he waived any right to be present.

Before the jury retired for deliberation, the parties agreed that exhibits which were not demonstrative would go back with the jury for deliberation. The State's attorney clarified the procedure for the 911 tape:

"MS. AHSENS:  With respect to the 911 call that is an exhibit that is going to go back with them but they won't be able to play it. This laptop has stuff on it from other cases and that laptop cannot go back but it's attached to this. If they want to hear the 911 call, we'll leave it open and Karla can stick it in there and play it.

"ADMINISTRATIVE ASSISTANT: He just said—

"MS. AHSENS:  It's not a readback, it's an exhibit. That's the way we've done it for previous trials."

Watson's trial attorney did not object, and the district court clarified that the 911 call would be played in the courtroom because that was where the equipment to play it on was located.

Criminal defendants have a right, protected by statute and the Sixth Amendment to the United States Constitution, to be present at every critical stage of a trial, including whenever the court communicates with the jury. *Herbel*, 296 Kan. at 1106-07. In *Herbel*, the jury was ushered back into the courtroom to view portions of a taped interview that had been admitted at trial. The judge conversed with the jurors and directed the tape to be played. On appeal, the Kansas Supreme Court found that the interaction between judge and jury outside the presence of the defendant violated his rights as it constituted a critical stage of trial. 296 Kan. at 1007-09. Here, unlike in *Herbel*, the judge did not enter the courtroom nor did he have any physical or verbal interactions with the jurors outside Watson's presence.

In *State v. Montanez,* No. 111,149, 2015 WL 2342382, at *3 (Kan. App. 2015) (unpublished opinion), the court noted that at the time *Herbel* was decided, K.S.A. 22-3420 required evidence to be exhibited to the jury "in the presence of the defendant unless he voluntarily absents himself." However, in a subsequent 2014 amendment, which was held to apply retroactively, the legislature clarified that the defendant's presence "is only required when the district court considers a written question from the

jury about instructions or evidence or a request to rehear testimony." 2015 WL 2342382, at *3; see K.S.A. 2016 Supp. 22-3420(d). The *Montanez* court concluded that this statutory change "eliminated any reliance on *Herbel* to construe the jury's review of evidence during its deliberations as a critical stage of the trial requiring the defendant's presence." 2015 WL 2342382, at *4. Although unpublished, we find this decision to be persuasive and supportive of our determination that Watson did not have a right to be present when the jury listened to the 911 call because this was a part of the jury deliberations rather than a critical stage of the trial.

With regard to Watson's alternative argument, we find that the trial assistant's presence to operate the computer to play the 911 call did not violate Watson's rights. Karla Lees, the bailiff and judge's administrative assistant, testified that she contacted the State's trial assistant to play the 911 call after the jury asked to listen to it. The trial assistant had played the evidence for both prosecutor and defense throughout the trial. Neither the bailiff nor the trial assistant had any communications with the jury while in the courtroom, and no one on the jury deliberated or actively spoke during their presence. It was within the sound discretion of the trial judge to provide for the jury to rehear the 911 call in a manner which would not risk access to additional documents on the prosecutor's computer and in a manner at least tacitly agreed to by defense counsel.

*Juror Misconduct*

Watson next argues that the district court erred in denying his motion for a new trial based on observations that jurors may have been dozing off or sleeping throughout the trial. He contends that the error should be construed as structural because he was essentially tried by a jury of less than 12. Alternatively, he argues that his constitutional right to a jury trial was violated, requiring the State to prove beyond a reasonable doubt that the error did not affect the outcome of his trial.

5

When reviewing claims of juror misconduct, the trial court must use a two-step inquiry to determine if a new trial or declaration of a mistrial is warranted. First, the court must determine "(1) whether juror misconduct occurred, and (2) if so, whether the misconduct substantially prejudiced the right to a fair trial, meaning whether the State can show beyond a reasonable doubt that the misconduct did not affect the trial's outcome." *State v. Longoria*, 301 Kan. 489, 530, 343 P.3d 1128 (2015); see *Bell v. State*, 46 Kan. App. 2d 488, 491, 263 P.3d 840 (2011), *rev. denied* 295 Kan. 1173 (2012).

During Watson's trial the parties identified at least one juror, Juror M, who appeared to have been sleeping at various times during the presentation of evidence. The State did acknowledge that another juror had appeared to be nodding off but may have simply been closing his eyes to think. There is nothing in the record to suggest that any jurors, other than Juror M, had more than momentary and isolated instances of inattentiveness. The trial court denied several requests for mistrial raised by defense counsel, but the parties agreed to designate Juror M as the alternate juror and that juror ultimately did not participate in the deliberation process.

In *State v. Armstrong,* 299 Kan. 405, 324 P.3d 1052 (2014), our Supreme Court affirmed the denial of a defendant's motion for mistrial based, in part, on inattentive jurors. In that case, the juror's dozing was isolated and momentary and there was no evidence that the sleeping jurors had not heard the testimony. 299 Kan. at 443. The court noted that it routinely held that a purportedly sleeping juror did not warrant a new trial, citing several cases in which a juror was alleged to have been sleeping and the court denied a mistrial or a new trial. 299 Kan. at 442-43.

In determining whether sleepy jurors impacted the defendant's rights, Kansas courts have considered the trial court's ameliorative actions when noticing jurors dozing off. See *Armstrong*, 299 Kan. at 441-43; *State v. Kirby,* 272 Kan. 1170, 1197-98, 39 P.3d 1 (2002). Here, the trial judge immediately had the jurors take a break after Watson's

6

counsel notified him that Juror M was sleeping and that other jurors looked sleepy. Throughout the rest of the trial, the judge gave more breaks than usual and had the jurors stand and stretch between witnesses in order to stay as alert as possible. The judge addressed the particular situation with Juror M by designating that juror as an alternate.

We find that the trial judge appropriately determined that the allegations of inattentive jurors did not warrant a new trial. Since we find no error occurred, we need not further address Watson's concerns regarding structural error or constitutional error.

*Prosecutorial Error*

Watson next argues that the prosecutor committed error in closing arguments by repeatedly arguing facts not in evidence and by misstating evidence. Without these errors, he contends that the jury likely would not have convicted him of attempted murder. The State responds that the prosecutor made reasonable inferences from the evidence.

Although Watson did not object to all of the prosecutor's allegedly erroneous statements, claims of prosecutorial error based on comments made in closing argument will be reviewed on appeal even when no contemporaneous objection was made at the trial level. See *State v. Roeder,* 300 Kan. 901, 932, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015).

Appellate review of alleged prosecutorial error is conducted under a two-step process established by our Supreme Court in *State v. Sherman,* 305 Kan. 88, 109, 378 P.3d 1060 (2016):

> "These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded

7

prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial." 305 Kan. at 109.

Prosecutors have wide latitude to craft closing arguments. *State v. McConnell*, No. 110,813, 2015 WL 3514001, at *4 (Kan. App. 2015) (unpublished opinion) (citing *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 [2000]). However, they cannot comment on facts not in evidence, make comments that serve only to inflame the jury's passions, and their statements must accurately reflect the evidence and law. *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (2012); *McConnell*, 2015 WL 3514001, at *4 (citing *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 [2013]). Inherent in this wide latitude is the ""freedom . . . to craft an argument that includes reasonable inferences based on the evidence.""" *State v. Carter*, 305 Kan. 139, 156, 380 P.3d 189 (2016) (quoting *State v. King*, 288 Kan. 333, 352, 204 P.3d 585 [2009]).

Watson argues that the prosecutor asserted facts not in evidence when by telling the jury:

> "What happens when he sees her on the floor? And remember he's out of shape, he's trying to catch his breath. Then he remembers the kids are at the park. I have to clean this body up. She's dead on the floor, bleeding. The kids can't see their mother like this.
> "So he takes her for a stroll down the hall. He pulls her. She did not walk down there by herself. She's found face down and unconscious near the bathroom floor. And there are swipe patterns created as she goes down the hall."
> . . . .
> "We know that after she's on the ground he wipes his hands off on her, just wipes his hands off, just like that, like she's nothing. Like what he did was nothing."

Watson argues "[t]here was virtually no evidence [he] attempted to clean anything," and that "[t]here was also no evidence whatsoever that Mr. Watson wiped his

8

hands on Ms. Cooper." A review of the evidence, however, reveals support for the prosecutor's assertion that Watson attempted to alter the crime scene. Cooper testified she was wearing glasses, a blue shirt, and underwear when Watson hit her with the dumbbell. The responding officer found Cooper shirtless and saw a pool of blood in the kitchen near the dumbbell, a shirt, and two teeth. When police later took pictures of the crime scene, Cooper's glasses were on the countertop near the microwave where she was standing when she was hit.

Additionally, there is some evidence to indicate that someone's bloody hands came into contact with Cooper's shirt. The State had Cooper look at pictures of her blue shirt. Cooper testified that on the back of the shirt, there were four stripes of what appeared to be dried blood.

"Q.:      What—Can you describe what you're seeing in the back of this—of State's 75, the back of this shirt.
What does that look like?
"A.:      Dried blood.
"Q.:      Ok. Is it in a pattern like vertical stripes?
"A.:      Yes.
"Q.:      How many vertical stripes do you see?
"A.:      Four."

The prosecutor's suggestions of which Watson complains were logical inferences from facts in evidence and were within the wide latitude allowed in crafting a closing argument.

Watson next argues that the prosecutor misstated evidence when telling the jury:

"You heard [Jeremiah] Morris testify that blood spatter is not created with the first blow. So we know he hit her more than once with that dumbbell. He came up behind

9

her. Whack. Right on the left side of her face. That created probably the gash to the back of her head that was bloody. Then he hit her again creating blood spatter to the left of the microwave. Then he hit her again, knocking off her glasses and knocking out her tooth with the root still attached."

Watson argues the prosecutor misstated the testimony of Jeremiah Morris, a forensic scientist who analyzed the blood patterns, by stating that spatter patterns on the microwave and walls were caused by multiple strikes to Cooper's head. A comparison of the prosecutor's statements, evidence, and Watson's argument show that Watson misunderstands the type and location of blood patterns to which the prosecutor was referring.

First, the prosecutor referenced spatter stains, not expiration patterns. Morris testified that an impact pattern can create a spatter stain like the one near the microwave. He explained that an impact pattern can be created by, for instance, clapping your hands when one of your palms has blood on it. The blood will spray outward, creating an impact pattern. When the prosecutor asked whether an impact pattern is typically seen from the first blow that is struck, Morris said no, and explained:

> "A. The first blow is the—is what creates the wound.
> "In order to—Impact patterns require that there be an exposed source of liquid blood.
> "So if there is no wound, there is no impact pattern.
> "The first blow, the first strike will create the wound.
> "Then that blood is now exposed to the surface.
> "The second blow or subsequent blows will then create the impact patterns."

In comparison, an expiration pattern, Morris testified, can be created by spitting or coughing, or getting hit in the mouth if there is already blood in it.

Second, the prosecutor referred to stains to the left of the microwave. Morris stated:

> "A. If you look, there is a collection of spatter stains that is located on the countertop south of the microwave.
>
> "In addition to that, there are—If you look at the microwave itself and focus on the front face of the microwave and the walls directly behind that, there is an expiration pattern. That expiration pattern covers all of those surfaces; the front face of the microwave and then extends to the walls behind the microwave."

Review of Morris' testimony and the pictures of the microwave reveal that "south of the microwave" means to the left of the microwave. As a result, the prosecutor's statement that the spatter patterns were caused by multiple impacts does not misstate the evidence. There is no evidence that Cooper was already bleeding before she was hit and Morris testified that blood must be exposed in order to have a spatter stain.

Watson next argues that the prosecutor misstated the evidence when she told the jury: "And he hits her again. We know that because she goes down, dragging her hands down with her, down the stove to where she lays on the floor and the blood pools." It is possible that Watson hit Cooper more than once. There was a "swipe pattern" of blood on the front of the stove. Morris stated "[t]hat movement is down moving left to right." The prosecutor's statement described a series of two to three blows to Cooper's head. The combination of blood spatter patterns and blood on the front of the stove lead to the reasonable inference that Watson hit Cooper multiple times and then Cooper fell to the floor, dragging her hands or body along the front of the stove. As a result, the prosecutor's statement did not misstate the evidence.

Watson next argues that the prosecutor misrepresented his 911 call by arguing he was already thinking of a defense. The prosecutor stated:

> "You know again from the 911 call.

11

. . . .

"He hasn't told dispatch anything yet other than he's hit her with a dumbbell and she needs assistance. And he hasn't said whether she's breathing, whether she's alive. His entire concern is I'm already building my defense. She was bothering me, she was nagging me."

. . . .

"And Mr. Magariel tells you it was only one hit to the head. He tried very valiantly to get every witness to say that. No one would agree. Sure, it's possible. But at the end of the day, it's possible that the sun is not going to rise tomorrow and aliens did this to Erica Cooper.

"What is beyond a reasonable doubt is that he hit her with that dumbbell in the head and he hit her multiple times. The doctor told you that, [Jeremiah] Morris told you that. You have to be hit more than once to create blood spatter. Period."

It does not appear to us that the prosecutor's characterization of Watson's 911 call exceeded permissible inferences allowed to the prosecutor in presenting the State's theory of the case. By mentioning "reasonable doubt," the prosecutor was, in this context, essentially just suggesting to the jury that there was sufficient evidence upon which they could convict Watson.

In summary, the statements by the prosecutor of which Watson complains were all reasonable and permissible inferences drawn from evidence in the record. We find nothing which would exceed the wide latitude afforded to the prosecutor in creating a vivid and potentially convincing narrative, drawing together the testimony and evidence which the jury has heard. Finding no prosecutorial error, we need not proceed to the second step of the *Sherman* analysis.

*Request for Lesser Included Offense Instructions*

Watson next argues that the district court erred by denying his request for lesser included offense instructions pertaining to the charged crime of level 4 aggravated battery

12

by knowingly causing great bodily harm or disfigurement. Watson requested and proposed jury instructions for the lesser included offenses of level 5 aggravated battery by recklessly causing great bodily harm or disfigurement; level 7 aggravated battery by knowingly causing bodily harm with a deadly weapon; level 8 aggravated battery by recklessly causing bodily harm with a deadly weapon; and simple battery, a class B misdemeanor. Following an instruction conference, the district court included only one lesser included offense instruction for Level 7 aggravated battery by knowingly causing bodily harm in any manner whereby great bodily harm, disfigurement, or death can be inflicted.

The standard of review when addressing challenges to jury instructions is based upon the following analysis:

> """(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

See K.S.A. 2016 Supp. 22-3414(3).

A criminal defendant generally is entitled to an instruction on the law applicable to his or her theory of defense if the instruction would be both legally and factually appropriate. The latter requires that there is sufficient evidence for a rational factfinder to find for the defendant on that theory. If the defendant requests an instruction at trial, the

court must view the evidence in the light most favorable to the defendant. *State v. Dupree*, 304 Kan. 377, 397, 373 P.3d 811 (2016).

An instruction on a lesser included offense is not foreclosed because it is inconsistent with either the evidence presented by the defense or the theory advanced by the defense. A defendant is entitled to pursue inconsistent defenses. *State v. Williams*, 303 Kan. 585, 599, 363 P.3d 1101 (2016).

We have jurisdiction to review the issue because Watson requested the lesser included offense instructions and the trial court denied the request. Further, there does not seem to be any controversy regarding the legal propriety of the requested instructions as representing lesser included offenses of the charged crime of aggravated battery. See *Armstrong,* 299 Kan. 405, Syl. ¶ 5.

With regard to the factual propriety of the requests, Watson argues that the evidence was sufficient to support an opportunity for the jury to determine the level of harm Cooper suffered and Watson's level of intent. The State argues that the evidence of Watson's state of mind and the severity of Cooper's injuries required only the lesser included instruction which was chosen by the judge.

Where, as here, the parties offer competing reasons why the requested instructions were or were not factually appropriate, we may bypass the third step of the analysis and proceed directly to the fourth step, harmlessness inquiry. Thus, we will assume—without deciding—that when the evidence is viewed in light most favorable to the defendant, it was sufficient for a rationale factfinder to find for the defendant on the requested lesser included offense, and proceed directly to consider whether the failure to give the instruction was harmless. *State v. Salary,* 301 Kan. 586, 598-99, 343 P.3d 1165 (2015).

We first note that, although Watson argues the alleged error should be classified as a constitutional violation, the Kansas Supreme Court has already decided that the statutory harmless error test is to be applied to determine whether the trial court incorrectly excluded an instruction. *Salary,* 301 Kan. at 599. This test requires that this court must be persuaded there is no reasonable probability that the error will or did affect the outcome of the trial.

The State is correct in arguing that by convicting Watson of level 4 aggravated battery, the jury necessarily found that Cooper had suffered great bodily harm or disfigurement. The jury thereby rejected the less serious level of harm—bodily harm or disfigurement—set forth in the lesser included instruction which was given. Thus, by extension, the jury also rejected the less serious level of harm specified in Watson's proposed instruction regarding use of a deadly weapon. We are able to say that on this point we are persuaded there is no reasonable probability that any error in failing to give the level 7 deadly weapon instruction, the level 8 deadly weapon instruction, and the misdemeanor battery instruction affected the outcome of the trial.

However, by rejecting Watson's proposed instruction regarding Level 5 reckless aggravated battery, the trial court did not allow the jury to determine whether Watson acted knowingly or recklessly when he hit Cooper with the dumbbell. The jury was instructed, according to PIK Crim. 4th 52.010: "A defendant acts knowingly when the defendant is aware that his conduct was reasonably certain to do the act complained about by the State."

Watson had requested that the jury also be instructed according to PIK Crim. 4th 54.310 (aggravated battery) when done recklessly as defined by PIK Crim. 4th 52.010:

"A defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that a result of the defendant's actions will follow.

15

"This act by the defendant disregarding the risk must be a gross deviation from the standard of care a reasonable person would use in the same situation."

Watson's argument regarding potentially reckless conduct focuses primarily on whether he was taking pain killers which had been prescribed due to hernia surgery the week prior the incident. It is unclear, however, how Watson would demonstrate that any diminished capacity due to his taking, or failure to take, the prescribed medication would have converted his conduct from "knowing" to "reckless." Watson neither testified in his own behalf nor proffered any medical testimony in this regard. Arguably, any diminishment in his mental capacity would constitute a separate statutory defense which was not raised or asserted at trial. See K.S.A. 2016 Supp. 21-5209.

The State points out that there is overwhelming evidence Watson acted knowingly and not recklessly. While Watson speculates in his appellate brief that it is possible he recklessly threw a dumbbell at Cooper, the defense at trial does not appear to suggest such a scenario. The defense did not contest that Watson approached Cooper in the kitchen and swung the dumbbell at her, striking her at least once. In the 911 call, Watson told the dispatcher that he "hit her with a dumbbell," which supports the inference of a knowing act. Cooper indicated that Watson was on the couch in the living room when she entered the kitchen. Watson had to intentionally get up, grab the dumbbell, and cross the room to the kitchen. When coupled with the evidence strongly suggesting that Watson then hit Cooper multiple times and attempted to move her body from the crime scene, there appears to be little or no factual basis for the trial court to have instructed the jury on lesser included offenses involving reckless conduct. We are persuaded that even if an error occurred by failing to include such instructions, there is no reasonable probability that the error affected the outcome of the trial.

16

*Clearly Erroneous Jury Instruction*

Watson also argues that jury instruction No. 16 was clearly erroneous, because it misstated the level of harm the defendant was required to intend. Jury instruction No. 16 states:

"The offense of aggravated battery, knowingly caused great bodily harm or disfigurement, with which the defendant is charged includes the lesser offense of aggravated battery, knowingly caused *great bodily harm* in any manner whereby great bodily harm, disfigurement or death can be inflicted.

"You may find the defendant guilty of aggravated battery, knowingly caused great bodily harm or disfigurement; aggravated battery, knowingly caused bodily harm in any manner whereby great bodily harm, disfigurement or death can be inflicted.

"When there is a reasonable doubt as to which of two or more offenses defendant is guilty, he may be convicted of the lesser offense only.

"Your Presiding Juror should mark the appropriate verdict." (Emphasis added.)
PIK Crim. 4th 68.080.

The State concedes that jury instruction No. 16 should have required only knowingly causing "bodily harm" rather than "great bodily harm" in the first paragraph as emphasized. The instruction Watson proposed contained the correct phraseology. Watson argues that the error blurs the distinguishing characteristic between the two levels of aggravated battery, and as such, was legally erroneous. We agree that jury instruction No. 16, as presented to the jury, contained a legal error.

We must then determine whether the instruction was so clearly erroneous as to require reversal. The "clearly erroneous" principle is not a standard of review, *i.e.*, a framework for determining whether error occurred. Instead, it supplies a basis for determining if an error requires reversal of a conviction. *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014); see *State v. Williams*, 295 Kan. 506, 510-16, 286 P.3d 195 (2012). A jury instruction is clearly erroneous "only if the reviewing court is firmly

17

convinced that the jury would have reached a different verdict had the error not occurred." *Williams*, 295 Kan. at 510. It is the defendant's burden to show that the error was clearly erroneous. 295 Kan. at 516

Here, jury instruction No.16 is an introductory description of the jury's ability to decide between a higher and a lesser charge of aggravated battery. Although jury instruction No. 16 does not initially include the correct description of level 7 aggravated battery, it does in fact provide the correct description of the lesser offense, "knowingly caused bodily harm," in the next paragraph. Further, jury instruction No. 17 correctly states the elements of the lesser included offense and accurately states the required level of harm intended:

> "If you do not agree that the defendant is guilty of aggravated battery, knowingly caused great bodily harm or disfigurement, you should then consider the lesser included offense of aggravated battery, knowingly *caused bodily harm* in any manner whereby great bodily harm, disfigurement or death can be inflicted.
> "To establish this charge, each of the following claims must be proved:
> "1. The defendant *caused bodily harm* to Erica Cooper in any manner whereby great bodily harm, disfigurement or death can be inflicted.
> "2. This act occurred on or about the 10th day of May, 2014 in Johnson County, Kansas." (Emphasis added.)

When objections are raised to jury instructions, we examine the "'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury.' [Citation omitted.]" *State v. Hilt*, 299 Kan. 176, 184-85, 322 P.3d 367 (2014); see *Dupree*, 304 Kan. at 394 (reading the instructions as a whole, they inform the jury sufficiently to support the defendant's conviction). Jury instruction No. 16, as a result, is not viewed in isolation since a jury would not view it in that manner. Because jury instruction No. 17 correctly states the elements of finding level 7

aggravated battery, we are firmly convinced that the jury would not have come to a different conclusion if jury instruction No. 16 was correct. The error does not require reversal.

*Cumulative Error*

Finally, Watson argues that he was not given a fair trial due to cumulative error. As we have determined above, the record fails to support the errors Watson raises and, thus, we cannot find cumulative error. *State v. Marshall,* 303 Kan. 438, 451, 362 P.3d 587 (2015).

Watson did not have a right to be present while the jury listened to the 911 call during their deliberations; the occasional inattentiveness of the jurors does not warrant a new trial; the prosecutor did not commit prosecutorial error during closing argument; the district court did not err in denying Watson's request for proposed lesser included offense instructions; and jury instruction No. 16 did not cause the jury to wrongly convict Watson of a higher degree of aggravated battery.

Affirmed.