IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,941

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER SHAWN PATTILLO,
*Appellant*.

SYLLABUS BY THE COURT

1.

Generally, an aggravated assault that escalates into a murder is not distinct from the homicide and cannot serve as the independent collateral felony necessary to support a felony-murder conviction. This general rule will not apply if there is a separation of time or distance or if an intervening factor breaks the causal relationship between the aggravated assault and the homicide. Applying those principles here, where 14 gunshots were fired in about 10 seconds and no intervening event occurred, the aggravated assault is not distinct from the homicide and the two crimes merge.

2.

Evidence, when considered in the light most favorable to the State, sufficiently establishes the mental-state element of the crime of aggravated endangerment of a child under K.S.A. 2019 Supp. 21-5601(b)(1), if a rational fact-finder could have found beyond a reasonable doubt that a defendant was aware of a substantial and unjustifiable risk that a child was in danger, but consciously disregarded that risk.

1

3.

The language of the aiding and abetting statute assigns criminal responsibility rather than creates a distinct element of a crime.

4.

Even if a drive-by shooting is motivated by an intent to kill a specific person, when the evidence is viewed in the light most favorable to the State, a reasonable jury could find a defendant guilty of aggravated criminal discharge of a firearm at an occupied dwelling when circumstantial evidence allows a jury to infer a participant in the crime fired shots at the dwelling.

5.

Two causation elements apply under the felony-murder statute. First, the death must be within the res gestae of the underlying crime, regardless of the sequence of events leading to the death. Courts define res gestae in the felony-murder context as acts done before, during, or after the happening of the principal occurrence when those acts are so closely connected with the principal occurrence as to form a part of the occurrence. Second, there must be a direct causal connection between the felony and the homicide. This direct causal connection exists unless an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death.

6.

A sentencing court's imposition of sentences for both felony murder and criminal discharge of a firearm does not violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution because the Legislature has expressed its intent to allow these cumulative punishments.

7.

Generally, under the invited error doctrine, a litigant who invites and leads a trial court into error will not be heard on appeal to complain of that action. In the context of jury instructions, appellate courts do not apply the rule in a formalistic or bright-line way. But appellate courts will generally apply the doctrine when a party requests the instruction before trial, the error was as obvious before trial as when the instruction was given, and the party did not present the trial judge the same objection as made on appeal.

8.

K.S.A. 2019 Supp. 22-3414(3) provides that the clear error standard applies if a criminal defendant fails to request a lesser included offense instruction at trial. Under that standard, even if a lesser included offense instruction is legally and factually appropriate, an appellate court will reverse only if it is firmly convinced that the jury would have reached a different verdict had the trial judge given the lesser included instruction.

Appeal from Shawnee District Court; MARK S. BRAUN, judge. Opinion filed August 21, 2020. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Steven J. Obermeier*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, C.J.: As Christopher Shawn Pattillo drove a van, an occupant of the van fired shots, killing Brian Miller and hitting a residence occupied by Miller's seven-year-old nephew. A jury convicted Pattillo of felony murder, aggravated assault of Miller, felony discharge of a firearm, and aggravated endangering of a child. Pattillo appeals, raising 10 issues about whether the underlying felonies can, as a matter of law, support Pattillo's felony-murder conviction and his sentences, whether the State met its burden of proving the underlying felonies and felony murder, and whether the trial judge erred in instructing the jury. We hold no reversible error occurred, and we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Hostilities between rival gangs underlie this case. The day before Miller's death, Pattillo and Miller's brother, who had known each other for years, purportedly exchanged derogatory comments about rival gangs during a chance meeting at a mall. Pattillo, Miller, Miller's brother, and the others involved in the shooting were gang members or affiliated with or supporters of various gangs or gang members. Miller's brother reputedly had a history of actions that Pattillo and his friends felt were disrespectful to the gangs they supported. Witnesses testified Pattillo did not like Miller's brother.

The day of the shooting Pattillo, his then-girlfriend, his girlfriend's young child, and two others were in a car that Pattillo drove through the neighborhood where Miller's brother, sister, and nephew lived together. Miller was visiting his siblings and nephew. Pattillo and the others in the car were traveling with several other people who rode in a

4

van. The mother of one of the people with Pattillo lived in the neighborhood, and the occupants of the two vehicles were on their way to her apartment.

As Pattillo and his group drove near the Millers' home, according to Miller's sister, Miller's brother and her son were across the street from their residence at a community bank of mailboxes. A fast-moving car caught her attention because she feared her son, who was near the street and talking to his uncle, might step in front of the car to return home. Pattillo drove the car, and he and others saw and recognized Miller's brother as they drove by.

While Pattillo and those in the car with him waited on their friend to return from inside his mother's apartment, they again drove by the Miller's home. Miller and his brother were outside on the front porch. According to Miller's brother, Pattillo locked eyes with him and stared in a threatening manner. Some of the people in the car saw Miller's brother reach toward his waistband in a manner suggesting he was pulling a firearm. One of the individuals with Pattillo told a detective that Pattillo yelled something to Miller's brother about shooting him and that "he had something for him and would be back for him."

Pattillo and the others in both vehicles went to the apartment of one member of the group. They discussed seeing Miller's brother pull a gun, and Pattillo reportedly questioned why Miller's brother would threaten a vehicle when there was clearly a small child in the car. One member of the group, De'Angelo Martinez, arranged to get a gun, and some of the group, including Pattillo, went to an apartment where Martinez retrieved the firearm. Pattillo then asked if he could drive the van, and he, Martinez, and two other men got into the van and returned to the Miller home with Pattillo driving.

5

They arrived, according to Miller's brother, about 30 minutes after they had last driven by in the car. Miller's brother testified he was standing at the front storm door talking to Miller, who was sitting outside on the porch. Miller's brother saw a van and then heard shots. He dove toward the floor inside the residence. Two bullets penetrated the lower part of the storm door. Miller's brother saw Miller stand up and try to run toward the back of building.

Some witnesses testified Pattillo stopped the van while Martinez fired the weapon several times toward the Millers' dwelling. As Miller ran, Pattillo slowly moved the van forward, appearing to give Martinez a better shot. Martinez fired about 14 shots over a 45-foot span in a 10-second period.

Miller's nephew was inside, playing in the front room. Several bullets hit the Millers' home, and some penetrated the exterior and hit inside walls and a television. The nephew testified he heard several shots and ran because he was scared.

Miller later died at a hospital. He had two gunshot wounds, one beneath the left buttock and a fatal shot in his back. That bullet hit his liver, diaphragm, and aorta. The other bullet apparently ricocheted off something before hitting Miller.

After a six-day trial, a jury returned a guilty verdict for felony murder based on the underlying crimes of criminal discharge of a firearm at an occupied dwelling, aggravated assault, and aggravated endangering of a child. The jury also returned guilty verdicts for criminal discharge of a firearm at an occupied dwelling, aggravated assault of Miller, aggravated endangering a child, and an alternative count of involuntary manslaughter,

and a not guilty verdict of first-degree premeditated murder. The judge sentenced Pattillo to a hard 25 life sentence for the felony murder, a consecutive 216 months for criminal discharge of a firearm at an occupied dwelling, a concurrent 12 months for aggravated assault, and a consecutive 6 months for aggravated endangering of a child.

Pattillo timely appealed.

ANALYSIS

Pattillo raises 10 issues, which we have reorganized for our discussion and analysis. Six issues present questions about the legal and factual basis for his convictions and sentences for felony murder and the underlying felonies. Pattillo's remaining four issues relate to jury instruction errors.

ISSUES ABOUT WHETHER UNDERLYING FELONIES SUPPORT
PATTILLO'S CONVICTIONS AND HIS SENTENCES

The first six issues largely revolve around various aspects of felony murder, the sufficiency of evidence, and the legality of his sentences. Many of these issues arise because a felony-murder conviction depends on an underlying, inherently dangerous felony, and Pattillo attempts to argue that none of the felonies can support his felony-murder conviction.

In Kansas, felony murder is "the killing of a human . . . in the commission of, attempt to commit, or flight from any inherently dangerous felony." K.S.A. 2019 Supp. 21-5402(a)(2). Here, the State charged Pattillo with three inherently dangerous felonies

7

that form the basis for his felony-murder charge:  aggravated assault, aggravated endangering of a child, and criminal discharge of a firearm.

In charging Pattillo with these crimes, the State did not assert that Pattillo fired the shots that hit Miller or the Miller residence. Instead, the State pursued the theory that Pattillo aided and abetted Martinez and was thus criminally responsible for Martinez' acts. The State relied, in part, on evidence that Pattillo went with Martinez to get a weapon, drove Martinez to the Miller residence, stopped the vehicle while Martinez fired shots, and then pulled forward at a slow speed so Martinez could get a better shot at Miller. The State argued Pattillo thus knowingly engaged in the unlawful venture and participated in a way that furthered the success of the venture. See *State v. Netherland*, 305 Kan. 167, 177-78, 379 P.3d 1117 (2016) (discussing aider and abettor liability for felony murder); *State v. Novotny*, 297 Kan. 1174, 1185, 307 P.3d 1278 (2013) (discussing grounds for criminal responsibility as aider and abettor). Under the law of felony murder, if someone dies because of the commission of an inherently dangerous felony "all the participants . . . [are] equally guilty of the felony murder, regardless of who fired the fatal shot." *State v. Thomas*, 239 Kan. 457, 462, 720 P.2d 1059 (1986).

Pattillo does not dispute that evidence of his involvement was admitted at trial, but he nevertheless argues none of his convictions for the three inherently dangerous felonies can serve as the basis for his felony-murder conviction. To affirm his felony-murder conviction, we need not affirm each of his convictions for the three felonies or find that each of the three felonies can legally support a felony-murder conviction. Instead, his conviction for felony murder can be affirmed if the jury's unanimous verdict on *any* inherently dangerous felony—sometimes referred to as an underlying or collateral felony—can be affirmed. *State v. Sanchez*, 282 Kan. 307, 319, 144 P.3d 718 (2006)

8

("[E]ven if a conviction on one underlying felony must be reversed, the felony-murder conviction can still be valid when, on a separate verdict form, the jury unanimously finds the defendant guilty of a different, legally sufficient felony that supports the felony-murder conviction.").

Some of Pattillo's attacks on the various underlying felonies arise from or relate to the so-called merger doctrine. The doctrine examines whether a felony proven by evidence that one of the participants inflicted the lethal wound can serve as the independent collateral felony supporting felony murder. At one point, Kansas law applied the doctrine to prohibit the lethal act from serving as the basis for the inherently dangerous felony because that felony merged with the homicide. But the Legislature has since changed that rule for some crimes. K.S.A. 2019 Supp. 21-5402(c); see *Sanchez*, 282 Kan. at 317-19 (discussing and showing historical application of doctrine). In doing so, the Legislature has created two categories of inherently dangerous felonies.

First, the Legislature has listed several crimes that can support felony murder regardless of "whether such felony is so distinct from the homicide . . . as not to be an ingredient of the homicide." K.S.A. 2019 Supp. 21-5402(c)(1). In other words, the merger doctrine never applies to these crimes. The State charged Pattillo with two crimes listed in this category: aggravated endangering a child, under K.S.A. 2015 Supp. 21-5601(b)(1), and discharge of a firearm at a dwelling, building, or structure in which there is a human, under K.S.A. 2015 Supp. 21-6308(a)(1)(A). See K.S.A. 2015 Supp. 21-5402(c)(1)(O), (c)(1)(S). Pattillo attacks his convictions for these underlying felonies and his felony-murder conviction by asserting that the State failed to present sufficient evidence of these underlying crimes. He also argues he cannot be sentenced for both felony murder and criminal discharge of a firearm.

9

Second, the Legislature listed several crimes that can be considered an inherently dangerous felony "only when such felony is so distinct from the homicide . . . as not to be an ingredient of the homicide." K.S.A. 2019 Supp. 21-5402(c)(2). The State charged Pattillo with one crime in this category:  aggravated assault. K.S.A. 2015 Supp. 21-5402(c)(2)(D).

We turn now to the specifics of his argument about each underlying crime, and we begin with his argument about his aggravated assault conviction.

1. *Pattillo's Aggravated Assault Conviction Merged with Felony Murder*

Pattillo contends the aggravated assault conviction for threatening Miller with a gun merged with the felony murder and cannot serve as an underlying felony supporting his felony-murder conviction. In doing so, he does not challenge his aggravated assault conviction; his argument is that it cannot serve as the basis for his felony-murder conviction.

Generally, an aggravated assault that escalates into a murder is not distinct from the homicide and cannot serve as the independent collateral felony necessary to support a felony-murder conviction. This general rule will not apply if there is a separation of time or distance or if an intervening factor breaks the causal relationship between the aggravated assault and the homicide. *State v. Leonard*, 248 Kan. 427, 431, 807 P.2d 81 (1991) (act of driving a semi-truck through a crowd could not support both aggravated assault and murder convictions because the one act was not separated in time and

distance and the one act caused the killing); see also *Sanchez*, 282 Kan. at 319 (aggravated battery was not so distinct from homicide to support felony murder).

The State argues this case does not fall within the general rule. It points to evidence that Miller attempted to get out of the line of fire after Martinez fired the first of about 14 shots and argues time and distance separated the shots.

We disagree that these facts remove this case from the general rule. The aggravated assault was not so distinct in time and distance from the ultimate homicide as to allow it to serve as the underlying inherently dangerous felony supporting Pattillo's felony-murder conviction. Instead, the evidence shows Martinez fired the shots in rapid succession and in the area where Miller sat and then fled. The aggravated assault thus merged with the homicide, and the felony murder cannot depend on the aggravated assault. K.S.A. 2019 Supp. 21-5402(c)(2). If this had been the only underlying felony, we would reverse Pattillo's felony-murder conviction. But if another inherently dangerous felony supports the felony-murder conviction it can be affirmed. *Sanchez*, 282 Kan. at 319.

2. *Sufficient Evidence Supports Aggravated Endangering of a Child Conviction*

We turn next to Pattillo's conviction for aggravated endangering of a child. Because the Legislature declared that the merger doctrine does not apply to the crime of aggravated endangering of a child, the State does not face a merger issue arising from this conviction. K.S.A. 2019 Supp. 21-5402(c)(1)(S). Still, Pattillo argues his conviction for aggravated endangering of a child cannot support his felony-murder conviction and must be reversed as a standalone conviction because the State failed to establish the crime's

11

elements. He argues the State had to prove he knew a child was in the house when Martinez fired the shots, but it failed to present sufficient evidence of this element.

In a criminal case, when a defendant challenges the sufficiency of the evidence presented by the State in support of a conviction, an appellate court examines the evidence in the light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. *State v. Johnson*, 310 Kan. 835. 840, 450 P.3d 790 (2019). And the court must examine all the evidence favorable to the prosecution and determine whether it satisfies the essential elements of a charge. *State v. Bolze-Sann*, 302 Kan. 198, 203, 352 P.3d 511 (2015). When making this review, a court does not ignore circumstantial evidence because a conviction of even the gravest offense can be based entirely on circumstantial evidence. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

To apply this standard of review, we must know what the State had to prove. The Legislature defined the crime of aggravated endangering of a child as "[r]ecklessly causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health is endangered[.]" K.S.A. 2019 Supp. 21-5601(b)(1). Those words do not expressly impose the requirement Pattillo argues the State failed to meet—the requirement that he knew of the child's presence in the house. Even so, he argues the requirement arises through the statutory definition of reckless conduct and because of what the State must prove to establish he is criminally responsible for Martinez' actions.

12

As to the statutory definition, a person acts recklessly "when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2019 Supp. 21-5202(j). Pattillo argues that to appreciate and then consciously disregard a risk to a child one must know the child is there.

But the definition requires proof that the defendant disregarded a substantial and unjustifiable *risk* that the circumstances exist; it says nothing about knowledge that the child was in the danger zone. This contrasts with the elements of the crime of endangering a child. One commits that crime by "*knowingly* and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health may be endangered." (Emphasis added.) K.S.A. 2019 Supp. 21-5601(a). Cf. *Bolze-Sann*, 302 Kan. at 204 (holding previous statutory definition of reckless conduct that required "a *realization* of the imminence of danger" meant State had to prove defendant knew someone was in imminent danger). Comparing the language of the two provisions reveals the Legislature did not impose the knowledge requirement Pattillo tries to write into the aggravated child endangerment statute.

At first blush it seems odd that the Legislature would require a knowing mental state for the crime with the less severe punishment and a reckless mental state for the crime with the higher punishment. The severity of the punishment, however, arises because of the certainty of danger. For the more severe crime, "the child's life, body or health *is* endangered." (Emphasis added.) K.S.A. 2019 Supp. 21-5601(b)(1). In contrast, the less severe crime requires that "the child's life, body or health *may be* endangered." (Emphasis added.) K.S.A. 2019 Supp. 21-5601(a).

13

In sum, no language in K.S.A. 2019 Supp. 21-5601(b)(1) or the definition of reckless conduct imposes a requirement that a person endangering a child must know a child is in danger. Courts apply the plain language of statutes and avoid adding, deleting, or substituting words. See *Kelly v. Legislative Coordinating Council*, 311 Kan. 339, 347, 460 P.3d 832 (2020). We thus will not add a requirement that the defendant knew the child was in danger. Even if we assume the statute is ambiguous, we would apply a canon of construction under which courts assume the Legislature intentionally omitted language or a specific feature in one statute if it included that language or feature in another statute. The Legislature's use of the language in one place shows it knew how to include the language or provide for the specific feature in other provisions. See *State v. Nambo*, 295 Kan. 1, 4-5, 281 P.3d 525 (2012). Here, in one provision the Legislature required a knowing mental state. It did not include the same language in the aggravated endangerment of a child provision.

Pattillo argues, however, the Court of Appeals panel deciding *State v. Herndon*, 52 Kan. App. 2d 857, 867, 379 P.3d 403 (2016), *rev. denied* 306 Kan. 1324 (2017), correctly held that to consciously disregard a risk of child endangerment one must know the child was present. But the *Herndon* panel referred to a reason to think there was a danger to a child—a concept inherent in recklessness and different from actual knowledge. Also, we distinguish the facts of *Herndon*.

In *Herndon*, the defendant fired shots at a pickup in which a small child was a passenger. In determining if the defendant had acted recklessly, the Court of Appeals panel concluded it "simply [found] a dearth of evidence to support the notion that [the defendant] was aware of the child's presence in the truck. It is hard to imagine how [the

14

defendant] consciously disregarded the risk to a child he had no reason to think was there." 52 Kan. App. 2d at 863-64. The critical words are that "he had no reason to think" the child was there. A difference exists between having a reason to think the child is present—that is, being aware of a substantial and unjustifiable risk that circumstances exist or that a result will follow—and the requirement Pattillo wants us to read into the statute—knowing a child is in a structure or motor vehicle. We acknowledge some broader language in *Herndon* that can be read to support Pattillo's argument. But the decision's holding is limited to the defendant recognizing risk, and the dearth of evidence in that case contrasts to the presence of some evidence that supports the jury's verdict convicting Pattillo.

Both Martinez and Pattillo had reason to know there was, in the words of the statute, a "substantial and unjustifiable risk" a child would be in the Millers' home. See K.S.A. 2019 Supp. 21-5202(j). Just 30 minutes before, the child had been outside with his uncle. And, according to the child's mother, her son had been near the road as Pattillo and Martinez drove by. From this circumstance, the jury could infer that the child's presence should have been obvious to a driver, such as Pattillo. What is more, circumstantial evidence showed that Martinez and Pattillo would have known of the relationship between the Miller brothers and the child. Miller's brother testified he had grown up with Martinez and they had been friends until Martinez joined a rival gang. There was also evidence that Pattillo had known Miller's brother for some time. Although there was no direct evidence that Martinez and Pattillo were aware of a risk the child was present, there was circumstantial evidence from which a jury could infer Pattillo was aware of a substantial and unjustifiable risk the child was in the residence.

The State also presented evidence that the plan had been to confront Miller's brother outside the residence where he had been when they drove by the second time. This plan meant Martinez would fire shots in the direction of the dwelling where the child lived and had been present just minutes before. This situation created "a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2019 Supp. 21-5202(j).

The evidence is not overwhelming, but it need not be. Evidence can establish the mental-state element of the crime of aggravated endangerment of a child under K.S.A. 2019 Supp. 21-5601(b)(1) if it establishes the defendant was aware of a substantial and unjustifiable risk that a child was in the danger zone but the defendant consciously disregarded that risk. Here, if we view the evidence in the light most favorable to the State, a reasonable jury could find that Pattillo was aware of the risk to the seven-year-old who lived in the dwelling and consciously disregarded that risk.

Pattillo also seems to argue that the fact the State had to prove he intentionally aided and abetted Martinez elevates the mental state requirement to one that requires proof of his knowledge. But the State's burden was to prove that Pattillo intentionally helped Martinez commit the crime, not that he knowingly put the child at risk. The intent requirement of aiding and abetting does not change the mental state of the underlying felony because the language of the aiding and abetting statute assigns criminal responsibility rather than creating a distinct element of a crime. See *State v. Betancourt*, 299 Kan. 131, 139, 322 P.3d 353 (2014).

16

Pattillo raises no other attack on his conviction for aggravated endangerment of a child. We thus affirm his conviction on that count and hold that his participation in that crime can serve as the inherently dangerous felony that supports his felony-murder conviction.

As we will discuss, Pattillo makes other arguments about why his felony-murder conviction cannot be affirmed. Before we reach those arguments, we discuss his argument that the State failed to meet its burden of proving he aided and abetted the criminal discharge of a firearm at an occupied dwelling.

3. *Sufficient Evidence Supports Criminal Discharge of Firearm Conviction*

Pattillo also argues the State failed to present sufficient evidence of the elements of criminal discharge of a firearm at an occupied dwelling. Under the aggravated form of the crime, which is what the State charged here, the State had to prove Pattillo aided and abetted the "reckless and unauthorized discharge of any firearm . . . [a]t a dwelling, building, or structure in which there is a human being" and that great bodily harm occurred. The State does not have to prove that "the person discharging the firearm knows or has reason to know that there is a human being present." K.S.A. 2019 Supp. 21-6308(a)(1)(A). Pattillo raises two arguments.

Pattillo first relies on the words "at a dwelling" to argue shooting at a person does not meet the requirement of shooting at a dwelling. We have rejected a similar argument in a case involving the same statute, although a portion of the statute that relates to shooting at motor vehicles. The language that is the focus of our analysis—shooting at an

17

object—does not change if the object is a motor vehicle rather than a dwelling. See K.S.A. 2019 Supp. 21-6308.

In *State v. Farmer*, 285 Kan. 541, 544, 175 P.3d 221 (2008), the defendant was in a drug-fueled rage when he walked up to a vehicle window, pulled out a gun, and shot the driver six times. The State charged him with criminal discharge of a firearm at an occupied motor vehicle. The defendant shot some bullets at close range and others while backing away from the car. A jury convicted him of criminal discharge at an occupied vehicle and felony murder. Like Pattillo, the defendant argued the jury could not convict him unless the State proved he intended to shoot at the vehicle, not the person in it. The dissent agreed, concluding: "The phrase, 'at [a] . . . motor vehicle,' does not look or sound ambiguous . . . . Shooting at a motor vehicle is one thing; shooting at a person is something else." 285 Kan. at 556-56 (Beier, J., dissenting).

But the court's majority rejected the argument, noting the Legislature designed the statute to cover situations in which proving the defendant's intent was difficult. The majority concluded that accepting the dissent's view, which Pattillo asks us to adopt, "eviscerates the criminal discharge statute by putting the focus right back on the shooter's intent, thus making it unavailable in the very situations it was designed to cover—situations where proof of intent to injure or kill is problematic." 285 Kan. at 547. See *State v. Jefferson*, 297 Kan. 1151, 1154, 1168, 310 P.3d 331 (2013) (criminal discharge conviction affirmed in retaliatory drive-by shooting at a house that resulted in death of bystander, even though defendant did not fire the fatal bullets, he participated in the unlawful venture).

18

This case is less nuanced, and we have no trouble unanimously holding that the State presented sufficient evidence of reckless discharge of a firearm *at a dwelling*. Martinez fired up to 14 shots, several of which hit the house and only two of which hit Miller. And one of those two bullets hit something else first and ricocheted into Miller. Two bullets hit the storm door where Miller's brother had been standing as Martinez fired the first shots.

Given the physical evidence, the State argues multiple reasons the jury could infer Martinez and Pattillo intended to aim shots at the residence. The evidence showed that Pattillo and the others returned to the Millers' residence with the intent to shoot Miller's brother. Miller's brother was at the storm door when they pulled up and stopped. When he dove for the floor, the jury could infer Martinez aimed some shots at the house on the chance one would hit Miller's brother inside the dwelling. But without being able to see Miller's brother, it cannot be said the shots were aimed at him; they were aimed at the dwelling. Two bullets penetrated the lower part of the storm door. At some point, Martinez focused on Miller, and some evidence suggests Pattillo drove the van in a way to give Martinez a better shot at Miller. Even at that point there is some evidence, when viewed in the light most favorable to the State, that Martinez aimed shots at the residence and not at Miller. As the State argues, a reasonable jury could conclude that Martinez took some shots at the dwelling to cut off the possibility that Miller, like his brother, would escape into the dwelling.

In his other argument, Pattillo alternatively contends that, if sufficient evidence supports the criminal discharge conviction, it only supports the lesser, level 7 felony version of the crime, instead of the level 3 version. For a conviction of a level 3 felony, the discharge must result in great bodily harm. K.S.A. 2019 Supp. 21-6308(b)(1)(B).

19

Great bodily harm is "'more than slight, trivial, minor, or moderate harm, [that] does not include mere bruising, which is likely to be sustained by simple battery.'" *State v. Robinson*, 306 Kan. 1012, 1027, 399 P.3d 194 (2017) (citing *State v. Green*, 280 Kan. 758, 765, 127 P.3d 241 [2006]). Miller suffered great bodily harm when Martinez shot and killed him; the State provided sufficient evidence to support the conviction for the level 3 version of criminal discharge of a firearm at an occupied dwelling.

In summary of this issue, the State presented sufficient evidence to support the conviction for criminal discharge of a firearm at a dwelling. Even if a drive-by shooting is motivated by an intent to kill a specific person, when the evidence is viewed in the light most favorable to the State, a reasonable jury viewing the evidence admitted at Pattillo's trial could find him guilty of aggravated criminal discharge of a firearm at an occupied dwelling.

4. *Sufficient Evidence Supports Felony-Murder Conviction*

Pattillo next attacks his felony-murder conviction by arguing the State failed to prove that Miller's death was caused by the commission of one of the underlying felonies. He argues the evidence more clearly supported an intentional murder of Miller. As we have discussed, however, sufficient evidence supports the aggravated endangering of a child and criminal discharge of a firearm felonies.

Pattillo also reasons intentional acts caused Miller's death and the death occurred intentionally rather than in the perpetration of the discharge of a firearm at a dwelling or of aggravated endangering of a child. He cites testimony establishing that Pattillo drove the van forward to give Martinez "a better shot" at Miller as he ran toward the back of the

20

dwelling and argues the State failed to prove an inherently dangerous felony—rather than an intent to kill—caused Miller's death.

Two causation elements apply under the felony-murder statute:  (1) the death must be within the res gestae of the underlying crime and (2) the underlying felony must directly cause the homicide. We discussed these elements in *State v. Berry*:

> "First, the death must be within the res gestae of the underlying crime, regardless of the sequence of events leading to the death. . . . We define res gestae in the felony-murder context as 'acts done before, during, or after the happening of the principal occurrence when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence.' . . . Second, there must be a direct causal connection between the felony and the homicide. . . . Our case law finds this direct causal connection exists unless an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death." *Berry*, 292 Kan. 493, 498, 254 P.3d 1276 (2011), *superseded by statute on other grounds as recognized in State v. Todd*, 299 Kan. 263, 273-74, 323 P.3d 829 (2014).

Miller's death occurred during the res gestae of the acts of discharging a weapon at a dwelling and of endangering a child. Evidence established that Martinez fired about 14 shots in around 10 seconds. During this time, shots hit the dwelling, came close to where the seven-year-old child played, and killed Miller. There was no evidence of an extraordinary intervening event. While some evidence might have supported an intentional murder, that does not mean the State failed to prove felony murder.

In summary of our consideration of Pattillo's sufficiency claims, sufficient evidence supported each of the underlying felonies and established a causal connection

21

between them and the murder. Although we find that the aggravated assault here is not so distinct from the murder that it can serve as the underlying inherently dangerous felony, if any of the underlying felonies are affirmed, the felony-murder conviction may be affirmed. *Sanchez*, 282 Kan. at 319-20. The State separately charged Pattillo and the jury unanimously convicted him of aggravated endangering of a child and criminal discharge of a firearm at an occupied dwelling, and both convictions are today affirmed.

5. *Multiplicity of Criminal Discharge and Felony-Murder Convictions*

In a related felony-murder argument, Pattillo argues he cannot be convicted of both discharge of a firearm and felony murder because the elements of criminal discharge are identical to some of the elements of the felony-murder statute. He argues this means he is receiving multiple punishments for the same conduct in violation of the Double Jeopardy Clause of the United States Constitution and Kansas statutes. This issue presents a question of law subject to unlimited review. *State v. Schoonover*, 281 Kan. 453, 462, 133 P.3d 48 (2006).

Our caselaw makes clear that if the Legislature intends to impose multiple punishments for violating two distinct statutory provisions—such as discharge of a firearm and felony murder—a judge does not violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution by sentencing the defendant for both offenses. See 281 Kan. 453, Syl. ¶ 7. And, we have recognized that the Legislature expressed its intent to allow cumulative punishments for felony murder and those underlying felonies that do not merge with the homicide. 281 Kan. at 490-91. As Pattillo recognizes, we have more specifically held that the Legislature intended to allow

22

cumulative punishments for felony murder and for discharge of a firearm at a dwelling. *State v. Conway*, 284 Kan. 37, 57, 159 P.3d 917 (2007).

Despite this authority, Pattillo tries to argue that if we apply the same-elements test—the test most commonly applied to determine whether two crimes punish the same conduct—we would necessarily determine the two crimes are multiplicitous and thus the trial judge violated his right to be free of twice being sentenced for the same crime. We need not test his theory because, in *Schoonover*, we recognized the same-elements test is merely a rule of statutory construction that courts need not employ if legislative intent to allow cumulative punishment is otherwise clear. 281 Kan. at 469, 490-91.

To illustrate we cited to the United States Supreme Court's decision in *Missouri v. Hunter*, 459 U.S. 359, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983), in which a double jeopardy issue arose under Missouri's felony-murder statute. In *Hunter*, the Court found it unnecessary to apply the same-elements test because "the Missouri Legislature [by enacting a felony-murder statute] has made its intent crystal clear. Legislatures, not courts, prescribe the scope of punishments." 459 U.S. at 368. And the Missouri felony-murder statute made clear courts can impose cumulative punishments. The same is true in Kansas. *Schoonover*, 281 Kan. at 490-91. We need not apply the same-elements test here to hold that a constitutional double jeopardy violation did not occur.

Pattillo also argues allowing the cumulative punishments violates K.S.A. 2019 Supp. 21-5109(b). In that provision, the Legislature has provided that a jury may not convict a defendant of both the crime charged and a lesser included crime. Pattillo then notes that statute defines a lesser included crime to include "a crime where all elements of the lesser crime are identical to some of the elements of the crime charged." K.S.A. 2019

Supp. 21-5109(b)(2). But Pattillo ignores another subsection of the same definition that explicitly states there are no lesser degrees of felony murder. See *State v. Dupree*, 304 Kan. 377, 400, 373 P.3d 811 (2016) (recognizing K.S.A. 2013 Supp. 21-5109[b][1]'s elimination of all lesser included offenses of felony murder). The Legislature made clear that the provision Pattillo cites does not apply to felony murder. His argument thus fails.

Cumulative punishments for both criminal discharge of a firearm and felony murder violate neither the Double Jeopardy Clause nor K.S.A. 2019 Supp. 21-5109.

6. *Pattillo Can Be Sentenced for Both Felony Murder and the Enhanced Punishment for Discharging a Firearm Resulting in Great Bodily Harm*

Pattillo raises a related argument that he cannot be punished for a criminal discharge of a firearm as a severity level 3, person felony and must instead be sentenced for a severity level 7 felony. He reasons that sentencing him for the level 3 felony causes him to be punished twice for killing Miller—once for felony murder and a second time for the enhanced sentence for criminal discharge of a firearm that results in great bodily harm.

To explain the difference in the severity levels that prompt Pattillo's argument, the statute prohibiting the discharge of a firearm at an occupied building provides three levels of severity:  severity level 7 for discharging a firearm no matter if there is bodily harm, severity level 5 if the discharge of the firearm causes bodily harm, and severity level 3 if it causes great bodily harm. K.S.A. 2019 Supp. 21-6308(b). He contends he would have been sentenced to a prison term of 29 months for the level 7 version as compared to the 216 months he received for the level 3 conviction.

24

Again, however, neither the Double Jeopardy Clause nor K.S.A. 2019 Supp. 21-5109 prohibit a cumulative punishment for felony murder and a severity level 3 discharge of a weapon that results in great bodily harm. The Legislature clearly intended to allow the cumulative punishments when it provided in the felony-murder statute that the two crimes do not merge. See *Hunter*, 459 U.S. at 368; *Conway*, 284 Kan. at 55-56; *Schnoover*, 281 Kan. at 490-91. Pattillo's argument fails.

JURY INSTRUCTION ISSUES LACK MERIT

Pattillo's remaining four issues raise claims that the trial judge erred in instructing the jury. We find no merit to any of the issues.

Appellate courts analyze each jury instruction claim under a three-step process: (1) whether the court can or should review the issue, that is, whether there is a lack of appellate jurisdiction or whether there was a failure to preserve the issue; (2) the merits of the claim; and (3) whether any error found was harmless. *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018). If the defendant did not make a contemporaneous objection to a jury instruction, appellate courts will review the claim of error for clear error. K.S.A. 2019 Supp. 22-3414(3); *McLinn*, 307 Kan. at 318. The appellate court also reviews for clear error if the defendant objected at trial but on a different basis than he or she later argues on appeal. *State v. Johnson*, 304 Kan. 924, 931, 376 P.3d 70 (2016).

In two issues, Pattillo contends the trial judge should have given lesser included offense instructions. When some evidence justifies a conviction of a lesser included offense, "the judge shall instruct the jury as to the crime charged and any such lesser

25

included crime." K.S.A. 2019 Supp. 22-3414(3). "In other words, lesser included offense instructions must be given when there is some evidence . . . that would reasonably justify a conviction of some lesser included crime." *State v. Rodriguez*, 295 Kan. 1146, 1152, 289 P.3d 85 (2012).

Applying these standards, we conclude the trial judge did not commit reversible error.

### 1. *Invited-Error Doctrine Precludes Review of Felony-Murder Jury Instruction*

Pattillo argues that the jury instruction on felony murder was erroneous because it did not instruct that there had to be a causal connection between the inherently dangerous felony and the killing.

The trial judge gave the suggested pattern instruction for felony murder, PIK Crim. 4th 54.120 (2018 Supp.), which instructed the jury it had to find that the murder happened while in the commission of an inherently dangerous felony. Before trial, Pattillo submitted this same PIK instruction as one he wanted the judge to read to the jury. Because he made this request, the State argues he invited the error and thus has not preserved the issue for our consideration.

Generally, under the invited error doctrine, "'a litigant who invites and leads a trial court into error will not be heard on appeal to complain of that action.'" *State v. Fleming*, 308 Kan. 689, 696, 706, 423 P.3d 506 (2018). In the context of jury instructions, we do not apply the rule in a formalistic or bright-line way, however. 308 Kan. at 701-02. But we have applied the doctrine when a party requests the instruction before trial, the error

26

was as obvious before trial as when the judge gave the instruction, and the party did not object to the instruction before the judge read it to the jury. 308 Kan. at 703.

Here, Pattillo proposed the instruction before trial and nothing at trial changed the legal argument Pattillo now makes. In other words, his counsel could have assessed and determined before trial that the judge should change the pattern instruction in the manner he now suggests. These circumstances support the State's position that Pattillo invited the error.

The third factor related to the failure to object to the instruction at the end of the trial is slightly more complicated because Pattillo objected to the instruction at the instruction conference. He did not object on the grounds he now asserts, however. Instead, he objected to the wording of the mental state element in the instruction. When he made this objection, he had notice of any other potential issues with the jury instruction, including the causation issue he now raises. Despite this notice, he focused on only Pattillo's level of intent to commit the underlying crimes and did not focus on the causal link between those crimes and the murder. Pattillo's objection thus did not suggest the trial judge needed to change the causation language from the language he invited the judge to use. We hold the invited-error doctrine will generally apply when a party requests the instruction before trial, the error was as obvious before trial as when the judge gave the instruction, and the party did not present to the trial judge the same objection as made on appeal.

Under these circumstances, we hold Pattillo invited the error, precluding our review of his asserted issue on appeal. See 308 Kan. at 701, 707.

27

## 2. *Invited Error Doctrine Precludes Review of Criminal Discharge Instruction*

Similarly, we hold the invited-error doctrine precludes our review of an issue Pattillo raises about the jury instruction on the crime of discharge of a firearm. He now argues the trial judge erred by only instructing the jury it had to find that great bodily harm occurred during the commission of the criminal discharge and not instructing the jury that it must also find that the great bodily harm resulted from the criminal discharge.

Again, before trial, Pattillo proposed the instruction the trial judge gave. He and his attorney could have assessed the error and discovered it before trial just as easily as they could discover it when the trial judge finalized the instructions. Finally, Pattillo offered no objection to this instruction at trial. Under these circumstances, we hold that Pattillo invited the error, precluding our review of his asserted issue on appeal. See 308 Kan. at 701, 707.

## 3. *No Clear Error in Not Instructing on Lesser Included Offenses of Criminal Discharge*

Pattillo argues the trial judge erred by not giving instructions on two lesser included offenses of the crime of criminal discharge of a firearm. He contends the judge erred by not instructing the jury on the severity level 7 felony, which does not require proof of great bodily harm. K.S.A. 2019 Supp. 21-6308(b)(1)(A). He also argues the trial judge should have instructed the jury on the elements of criminal discharge of a firearm from a public road. That crime occurs when a person fires the weapon "upon or from any public road, public road right-of-way or railroad right-of-way except as otherwise authorized by law." K.S.A. 2019 Supp. 21-6308(a)(3)(B).

28

We need not discuss the legal or factual appropriateness of either proposed lesser included offense because, even if we assume the trial judge should have given both lesser-included offense instructions, Pattillo cannot establish reversible error.

Our standard for reversibility is clear error because Pattillo did not request either lesser included offense instruction at trial. K.S.A. 2019 Supp. 22-3414(3). Under that standard, even if a lesser included offense instruction is legally and factually appropriate, under the third step of the reversibility inquiry the court will reverse only if firmly convinced that the jury would have reached a different verdict had the trial judge given the lesser included instruction. *McLinn*, 307 Kan. at 318.

We are not firmly convinced the jury would have reached a different verdict had the trial judge given the lesser included instruction about the level 7 felony because no one disputes that Miller suffered great bodily harm when he was killed.

We likewise are not firmly convinced the jury would have reached a different verdict had the trial judge instructed on the crime of discharge of a firearm from a public road. We find persuasive the analogous caselaw of *State v. Williams*, 308 Kan. 1439, 430 P.3d 448 (2018).

*Williams* dealt with alleged error in failing to instruct on assault and battery as lesser-included offenses of aggravated assault and aggravated battery. The defendant went to a female acquaintance's house, broke in, strangled her, head-butted her, and threatened her with a baseball bat. Reviewing for clear error, we were not firmly convinced a jury would have reached a different verdict given the uncontroverted

29

evidence of the harm inflicted and the fact a threat with a baseball bat took place after the defendant had inflicted great harm. 308 Kan. at 1458-59.

A similar analysis applies here. There is little dispute that Pattillo participated in an activity with another individual who fired a weapon in the direction of a residence and a person died as the result. We are not firmly convinced the jury would have returned a different verdict had the trial judge given an instruction on a lesser included offense that allowed consideration of a discharge of a firearm from a public roadway when Martinez and Pattillo engaged in conduct that resulted in multiple gunshots to an occupied dwelling.

4. *No Clear Error in Failing to Give Lesser Included Offense Instruction of Endangering a Child*

Finally, Pattillo argues the trial judge erred by not instructing the jury that it could convict Pattillo of endangering a child. As we have discussed, that crime occurs by "*knowingly and unreasonably* causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health *may be* endangered." (Emphasis added.) K.S.A. 2019 Supp. 21-5601(a). As convicted, the jury found Pattillo "[*r*]*ecklessly* caus[ed] or permit[ed] a child under the age of 18 years to be placed in a situation in which the child's life, body or health *is* endangered." (Emphasis added.) K.S.A. 2019 Supp. 21-5601(b)(1). The italicized language highlights the differences in the two statutes.

Pattillo did not ask the trial judge to give the lesser included offense instruction so we review for clear error. Again, even assuming the factual and legal appropriateness of

30

the instruction, Pattillo fails to establish clear error. As Pattillo himself argued, there is no evidence that Martinez and Pattillo knew the child was in the residence. For that reason alone, we could conclude that we are not firmly convinced the jury would have returned a different verdict had the judge instructed on the elements of endangering a child. In addition, as noted in the other arguments about lesser included offenses, the jury convicted on several felonies with heightened degrees of severity and potential for harm. Here, the evidence established that Pattillo's actions endangered the child's health, not just that he might have done so. Although not physically harmed, the child was receiving mental health treatment at the time of trial, and he told the jury about his anxiety arising from the incident. His mother testified he feared going outside and had heightened anxiety brought on by loud noises like fireworks.

We are not firmly convinced the jury would have returned a different verdict had the judge instructed on endangering a child.

## CONCLUSION

We affirm Pattillo's felony-murder conviction based on the underlying inherently dangerous felonies of criminal discharge of a firearm at an occupied dwelling and aggravated endangering of a child and his sentence on the felony-murder conviction. And, although we hold aggravated assault cannot serve as the inherently dangerous underlying felony in this case, he does not ask us to reverse that conviction. We also affirm his convictions for felony discharge of a firearm and aggravated endangering of a child. Finally, we affirm his sentences.

Affirmed.

31

WILSON, J., not participating.

PATRICK D. MCANANY, Senior Judge, assigned.[1]

JOHN L. WEINGART, District Judge, assigned.[2]

_____

[1]**REPORTER'S NOTE:**  Senior Judge McAnany was appointed to hear case No. 118,941 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

[2]**REPORTER'S NOTE:**  District Judge Weingart was appointed to hear case No. 118,941 vice Justice Wilson under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.